James **HENDERSON**, Appellant,

v.

William H. **BANNAN**, Warden, Appellee.

No. 13208.

United States Court of Appeals
Sixth Circuit.

June 4, 1958.

Ernest Goodman, Detroit, Mich. (Goodman, Crockett, Eden & Robb, G. Leslie Field, Detroit, Mich., on the brief), for appellant.

Samuel J. Torina, Lansing, Mich. (Thomas M. Kavanagh, Atty. Gen., Daniel J. O'Hara, Perry A. Maynard, Asst. Attys. Gen., on the brief), for appellee.

Before McALLISTER, MILLER and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

This is an appeal from an order of the district court denying appellant's petition for a writ of habeas corpus.

Appellant was arrested on August 5, 1942, for the crime of rape. He pleaded guilty on that day and was sentenced to life imprisonment by the Circuit Court for Macomb County, Michigan. More than five years after he had been sentenced to prison, on October 20, 1947, appellant filed with the Circuit Court for Macomb County an application for leave to file a delayed motion for a new trial and to set aside the sentence imposed upon him. In his motion for a new trial, he set forth, among other contentions, that his constitutional rights were disregarded on his trial, and that he did not have the assistance of counsel. He further set forth that he had not known the full consequences of a plea of guilty; but he did not claim that he was innocent of the crime charged. The Circuit Court thereafter denied appellant's application to file a delayed motion for a new trial, on March 31, 1948.

On June 24, 1952, a further motion for a new trial was filed by counsel presently representing appellant. The Circuit Court for Macomb County denied this motion also.

Thereafter, application for leave to appeal to the Michigan Supreme Court was filed, and, in June, 1953, was denied without opinion.

A petition for a writ of certiorari was then filed with the United States Supreme Court; but before that court had taken any action upon the application, the Michigan Supreme Court, on the petition of the Attorney General of Michigan, in 1953, remanded the case to the Circuit Court of Macomb County for the purpose of taking additional evidence, and for reconsideration.

On the remand, the Circuit Court for Macomb County heard twelve witnesses in open court, including appellant, and in a written opinion, again denied the motion for a new trial.

An appeal was taken to the Michigan Supreme Court, which, in a comprehensive opinion, People v. Henderson, 343 Mich. 465, 72 N.W.2d 177, affirmed the order denying a new trial. Thereafter, a motion for rehearing was denied. Subsequently, a petition to the United States Supreme Court for a writ of certiorari was denied. 351 U.S. 967, 76 S.Ct. 1033, 100 L.Ed. 1487.

After the conclusion of all the above proceedings, appellant filed the petition for a writ of habeas corpus in this case, on August 1, 1956, in the district court, and, on December 21, 1956, Judge Lederle, after filing findings of fact and conclusions of law, denied the petition for the writ. From the denial of the petition, appeal was taken to this court.

On this appeal from the order of the district court denying the writ of habeas corpus, Henderson claims: (1) that his conviction and sentence were not in accordance with the due process clause of the Fourteenth Amendment, under the circumstances disclosed by the record,

since he was without legal counsel and was not offered counsel; and (2) that appellant was denied due process, under the circumstances disclosed by the record, since his plea and conviction took place at a specially convened night session of the court, and that he pleaded guilty because of fear of action by a mob then surrounding the courthouse.

The more detailed factual background of the case, as appears from the state court hearing on the plea of guilty, is as follows: Appellant, a Negro, had resided in Mount Clemens, Macomb County, Michigan, for about seven years before the incidents herein related. On the morning of July 29, 1942, he obtained a job at a tavern near Mount Clemens. This job required that he live on the premises. At about midnight of his first day of work, the manager of the tavern asked a waitress, who was a young married white woman, to drive appellant, in her car, to the place where he stayed in Mount Clemens, in order that he could pick up his clothing, and then to bring him back to the tavern. She agreed, and proceeded to drive appellant to the place where he stayed. It was during this drive that, after midnight, the claimed rape occurred. Immediately thereafter, appellant disappeared. In the morning, the woman filed a complaint against him, charging him with the crime of rape committed against her. It appears that appellant went that night to Detroit, afterward to Ypsilanti, and then to Chicago where he got a job for a few days. He subsequently went to South Bend, Indiana, and on August 5, came back to Ypsilanti, on his way to Mount Clemens, where he had been waiting to be drafted into the Army. He returned because he thought the time had arrived for the draft. While in Ypsilanti, he stopped with friends who told him that the police had been at their home looking for him; and they showed him a newspaper stating that he was wanted for rape. Appellant's friends then told him that if he were not guilty, he had better go back to Mount Clemens and see what he was wanted for. Appellant replied to them that there was nothing for him to do except turn himself in. He went to the State Police Office in Ypsilanti and identified himself. The State Police then took him to their barracks near Detroit, where the Mount Clemens police met him and took him to the jail in Mount Clemens. Appellant stated that he was questioned at the jail and that he there signed a confession. Some hours later, he was taken to the courtroom of Judge James Spier, the Circuit Judge for Macomb County, about 10:00 p. m. Thereafter, Judge Spier arrived and opened court about 10:20 p. m. The case against appellant was then called and the information which charged him with rape was read, in open court. There then took place a comprehensive questioning and examination by Judge Spier, and by the Prosecuting Attorney.

### Proceedings on Plea of Guilty.

Judge Spier first inquired of Henderson whether he knew what he was charged with, and appellant replied that he did. In answer to the questions of the court, appellant stated that he wanted to plead guilty of his own free will; that nobody had threatened him, or "beat up" on him, or promised him anything to get him to plead guilty; and that the reason he pleaded guilty was because he had actually forced the woman to have intercourse with him. In response to questions of the prosecuting attorney, appellant stated, in open court, that he had wanted to tell the prosecutor "all about it" when the latter came to the jail; that the prosecutor had explained what his constitutional rights were; that everything the appellant told the prosecutor was of his own free will, and done with knowledge that it could be used against him; that he wanted to make a full confession and get the matter over; that he was told, by the prosecutor, that no threats or promises or inducements of any kind could be made or offered to get him to make any statement; that no one could in any way intimidate him or use any force to make him confess; that no such tactics were used upon him, by any

police or law enforcement officer; and that no one had laid hands upon him, or touched him.

Appellant told the court, further, that he had never seen the woman before that one day that he worked at the tavern, where she was a waitress. He stated that his job was to rise early in the morning, to clean the place up. It was understood that he was to stay out of the public part of the tavern. Appellant further stated that the manager of the place, in his presence, had asked the young woman if she would drive. appellant to his place to get his clothes; and that she, at the request of, and as an accommodation to the manager, agreed. Appellant then told the court that, that night he had with him a piece of steel about fourteen inches long, with black cloth around it; that, after the young woman had driven him a certain distance, he took the steel out of a bag and "made out" that it was a knife; that he then threatened her with the "knife," to frighten her into submitting to intercourse with him; that he made her stop and get out of the car; that the girl was in fear of her life, because of his threats with the knife, and told him: "Don't hurt me, I will do anything you want"; and that, because of her fear of being killed, she let him have intercourse with her. After getting into the car again, he had her continue to drive and then forced her to have intercourse again with him; that "the second time I did not threaten her, but I guess she was still scared from the first time from seeing (the knife) so she said 'put it away, I am going to do what you said.'" In answer to the question of the circuit judge, appellant stated that when he had intercourse with the

girl, he knew she was in fear of her life, and that that was the reason she submitted. Finally, on the highway to Detroit, appellant had the car stopped and got out. He stated that he had taken everything the girl had in her purse, amounting to $2.90. She had practically no gasoline left, and when he was leaving her in the midst of the country, sometime after midnight, and had no money to get any gas, as he told the court, he gave her back fifty cents of the money that he had taken from her.

Appellant, at the time he pleaded guilty, told the court that he had previously been convicted of robbery, unarmed, in Detroit, Michigan, and had been sentenced to serve one to ten years. After serving eighteen months in the Ionia Reformatory, he had been released. Appellant had also been arrested in Cleveland, Ohio, for having intercourse with a girl under the age of consent, but told the court that he had been released because it had taken place in a disorderly house. He further admitted to Judge Spier, at the time of the hearing on his plea of guilty, that he had had syphilis, but had been cured. As to appellant's knowledge of the fact that his guilt of the rape might carry a life sentence, appellant stated that, in spite of that fact, he would not change his plea because he knew he was guilty and that there was no use trying to fight it.[1]

A reading of the long and comprehensive examination of the appellant in open court, by Judge Spier and the prosecuting attorney, that runs to twenty-seven printed pages, leaves the impression that both the sentencing judge and the prosecuting attorney were actuated by a sincere desire to accord to appellant his con-

---

1. In reply to Judge Spier's questioning on this point, appellant answered:

"Q. You know the seriousness of what you have done? A. Somewhat, sir.

"Q. What kind of sentence you think you ought to get? A. I am ready for anything that is supposed to come to me.

"Q. What? A. I am willing for anything supposed to come to me, sir.

"Q. You know it carried a life sentence, do you? A. I didn't know that, no sir. I didn't know that, sir.

"Q. Do you have any idea what kind of sentence it carried? A. Somewhat, sir. I have heard of cases, sir.

"Q. What? A. I have heard of several cases, sir.

"Q. The fact it might carry a life sentence, that make any difference in your plea of guilty? A. I wouldn't change my plea because I know I am guilty; no use trying to run around—trying to fight it."

stitutional rights; to ascertain the facts; to make sure that appellant understood what he was charged with committing, and that his plea of guilty was of his own free will, and was not made as the result of threats, promises, or inducements of any nature, by police officers or law enforcement authorities of any character, and that no one had used any force upon appellant—that no one had "laid any hand on" him or "ever touched" him.

After the extensive examination of appellant, and upon the motion of the prosecuting attorney for the maximum sentence on the ground that Henderson was guilty not only of rape but of armed robbery, and that he was not "the type that should ever be allowed to mingle with society again," the court imposed a life sentence.

### Motion for a New Trial.

In his motion for a new trial, or, in the alternative, a motion for leave to file a delayed motion for a new trial—under the liberal Michigan practice in such cases—which was here filed ten years after he had been sentenced, appellant contended that the sentence was illegal and void for the reason that he had been interrogated, arraigned, convicted, and sentenced "without the advice of counsel or the opportunity to obtain an attorney, without the counsel of friends or the opportunity to communicate with friends, without a public trial, without the interrogation of the complaining witness against him, and solely on the basis of a confession of guilty made by the defendant following threat of mob violence by persons gathered outside the court building at the time." Appellant, in his motion, further contended that the trial, conviction, and sentence, under the circumstances set forth in his attached affidavit, constituted a denial of due process, contrary to the provisions of the Fourteenth Amendment to the Federal Constitution; that appellant confessed to the crime of rape only because of the circumstances surrounding his detention and interrogation, and because of the threats made against him, and not because he was guilty of the crime; that he

would not have pleaded guilty if he had had the opportunity of consulting with counsel or friends or relatives, and if the entire proceedings had not been hastily rushed through at a closed night session, during a period of approximately three hours; that he was entitled to have his guilt or innocence determined by an impartial jury at a public trial, with sufficient time for preparation, after being afforded the right of counsel, without intimidation by a hostile mob outside the courtroom, and after presentation of evidence against him, and particularly the testimony of the complaining witness; and that there had been a substantial miscarriage of justice and denial to defendant of his rights under the Michigan and Federal Constitutions, which could only be rectified by the granting of a new trial.

Appellant's motion for a new trial was based upon his affidavit attached thereto, in which he set forth a number of alleged facts, which he claimed sustained his motion for a new trial.

Among the sworn statements in his affidavit attached to his motion for a new trial, appellant set forth that he was interrogated in the Mount Clemens jail, on the evening of his arrest, by the chief of police and the justice of the peace; that he had "denied that he was guilty of the crime of rape and told them of the incidents which had occurred during the night of July 29, and the early morning of July 30, 1942, negating any such crime or intent to commit any such crime; that while he was in the cell at the Macomb County jail, several policemen told him that a mob had gathered on the outside of the jail and that unless he confessed to the crime, they would turn him loose to the mob; that thereafter, and at approximately 9:00 p. m., to the best of his knowledge and belief, he was taken out of the cell and led through a tunnel from the jail to the Macomb County Court House and there taken by elevator to the 9th floor where he was brought into the court room of Judge Spier; that while in the courtroom, he was further interrogated by police, de-

tectives and officials in an effort to obtain from him a confession of the crime; that he continued to deny that he had committed any crime and requested that his brother or some other member of his family be called so that he could talk to them. This and similar requests were denied. That during the period of this questioning, a police officer told him to look out of the window to the street below, that a mob had gathered and that he would be turned loose to the mob if he did not confess. That he did look through the window and saw a large number of people below, some of them looking up in his direction. That as the interrogation continued, he again asked to see a relative or a lawyer. He was advised by the persons who were interrogating him to confess to the crime. He was told by one of the persons who interrogated him that he would 'get a break' if he confessed. He asked on several occasions why the police didn't bring the complaining witness to court. He was told that she was not available. Finally, deponent, under the continuous questioning and because of the lack of a friend, advisor, or lawyer, by reason of the threat of the mob on the street below and despite the fact that he then knew, as he does now, that he was innocent of the charges against him, agreed to confess to the crime of rape which he did not commit." All of these claims formed the principal basis of appellant's contention that his conviction and sentence were illegal and void, and that he had been deprived of due process of law.

In addition to the foregoing, appellant set forth in his affidavit attached to his motion for a new trial, that shortly after 10:00 p. m. on that same day of his arrest, Judge Spier convened court; that numerous statements were made by the judge and the prosecuting attorney, and that he was questioned at considerable length, during which questioning he admitted that he had committed the crime of rape; that during the entire period he was in the court room, it was not open to the public, and no members of the public, to the best of his knowledge and belief, were even permitted to come into the court room, and that the only persons present were the court officials, attachés, police, detectives, and newspaper reporters; that so far as he knew, appellant was not arraigned before the justice of the peace, nor was he asked to waive an examination, nor did he do so; that he was sentenced at approximately 11:00 p. m., and taken by the police to the prison in Pontiac, and the following day to the state prison at Jackson. Appellant further set forth that he had obtained copies of the Mount Clemens daily newspaper published on July 30, July 31, and August 6, 1942, "with respect to the threats and the mob," which he attached to his motion for a new trial; and appellant deponed that the information was true to the best of his knowledge and belief.

### Denial of New Trial.

In denying appellant's motion for a new trial, Judge Spier in a detailed opinion that runs to ten printed pages found that appellant's statement in his affidavit attached to the motion for a new trial were untrue, and that the principal claims set forth were, to the personal knowledge of the court, completely false.

As to the contention that appellant pleaded guilty because of fear of a mob, Judge Spier found, in his opinion denying the motion for a new trial, that the claimed existence of a mob was a fabrication. In discussing this aspect of appellant's claim, the court referred to appellant's affidavit in support of his motion for a new trial, in which he swore that he had been taken out of his cell and led through a tunnel from the jail to the Macomb County Court House. The court found that this statement was false, as there was no such tunnel in existence, and that the only way prisoners could be taken from the jail to the court house was across a main thoroughfare, to the opposite side of the street where the court house was located. The salient point of this circumstance is obvious. If there was a mob gathered around the court house when appellant was removed from the jail to be taken to court, he

would have seen the mob at that time and have been obliged to pass through the mob to get to court. But, of course, he did not pass through such a mob; nor did he claim that he did; nor did he claim that he saw a mob when he came from the jail to court. To account for the fact that he did not see the mob at that time, and was not forced to pass through the mob to get to court, he had recourse to the story of the tunnel; and the only explanation why he concocted the story of the tunnel must be that he had remembered, from the time he was previously sentenced in Detroit, on the charge of robbery unarmed, that, in that city, prisoners came from the jail through a tunnel to the court house; and he, evidently, assumed that there was also such a tunnel at Mount Clemens. But his statement was false.

As to appellant's statement in his affidavit that when he was taken to the court room, during the period before the judge appeared on the bench, he looked through one of the windows of the court room and could see the mob below in the street, the court observed that the affidavits of the officers who were in charge of appellant at that time declared that appellant had not been allowed to go about freely in the court room; that he was kept close to them; and that at no time, was he near any window. Furthermore, Judge Spier found that "Because of abutments it is physically impossible to see the street or sidewalks from the court room windows where defendant was arraigned, with the exception of one window from which can be seen the intersection of streets and sidewalk located one block west of the intersection on which the jail is situated. Neither the jail, nor street intersection located there, nor the sidewalk between the jail and the main entrance of the County Building, can be seen from this one and only unobstructed window." Judge Spier further stated, in his opinion denying the motion for a new trial, that if there had been any unusual number of people interested in the proceedings, there was nothing to stop them from coming into the building or court room; that all doors were unlocked at the time, and an elevator was running for public use, as other public gatherings were going on in the building; and that defendant's affidavit itself indicated that only the usual persons customarily found present at arraignments—even at morning or afternoon sessions, namely, newspapermen and court attendants—were present. Judge Spier went on to say, in his opinion, that he himself would have been aware if there had been any unusual number of persons either around the jail or the court house, and would have had a lasting memory of such a situation; that, in his experience of twenty-three years as a judge, there had never been the formation of a mob, in connection with any case before his court, and that there had never been even an intimation of such a mob, prior to the filing of appellant's affidavit. In finding that the allegation of the existence of a mob was a fabrication, the court stated that it was based upon a newspaper article that had quoted the officers as merely saying that their fear of violence was the reason for asking for an immediate hearing; but that the news article in no way intimated the existence or imminence of any mob, or even curious groups; and that the affidavits of the officers showed that no mob existed.

With regard to appellant's claims that he had been in fear of a mob because of statements of officers at the jail before he had admitted his guilt, and that he had been denied opportunity to advise with his friends, the court remarked that he had every opportunity, while before the court, to make known any such desire in the course of the free discussion that took place at the time of his plea of guilty and his questioning, which, as mentioned, extended through twenty-seven printed pages of the record. The court further observed that appellant had some familiarity with court proceedings since he had been through an identical experience in 1936 when he pleaded guilty in court; and that, then, the next day, he had changed his plea to not guilty, and had a

lawyer appointed; and then had later pleaded guilty again. Judge Spier mentioned after reviewing the record, that appellant, at the conclusion of his examination in open court, had finally stated: "I wouldn't change my plea because I know I am guilty; no use trying to run around trying to fight it."

While Judge Spier declared that false statements by officers to an accused, of threatened or probable mob violence could readily be held to be sufficient grounds for a new trial if the accused were intimidated thereby—even though no actual mob ever existed—nevertheless, in this case, appellant had destroyed the reliability of his claims as to threats or intimidation, by falsely swearing to the actual existence of a mob, and to having seen it with his own eyes.

In the course of his opinion denying the motion for a new trial, on January 15, 1953, Judge Spier observed that appellant had previously filed, on October 23, 1947, an application for leave to file a delayed motion for a new trial and to set aside the sentence, together with a motion for a new trial and a writ of habeas corpus ad testificandum, as well as a brief in support of the motion for a new trial and to set aside sentence; that these papers consisted of fifty typewritten pages; that the motion was argued before the court on February 9, 1948, by counsel who had filed appearance for appellant three weeks prior to that time; that, on February 24, 1948, the court had filed a fifteen-page opinion denying the motion for a new trial, analyzing the principal grounds on which it had been submitted and argued, namely, the absence of counsel for the defendant at the time of arraignment; that on March 31, 1948, the motion was denied; that on May 15, 1948, counsel for appellant filed a motion for rehearing of the motion for a new trial; that in neither of the motions was there any claim that appellant had been intimidated, or that he was innocent; that the court had read every paper filed by appellant or his counsel during the ten-year period, subsequent

to his plea of guilty, and that nowhere did appellant, or his counsel, make any claim that he had entered his plea of guilty by reason of any fear or intimidation or threats of violence, or mob violence, nor did any of these papers filed by appellant or his counsel discuss any claim, or give any intimation that appellant was not guilty of the crime to which he had pleaded guilty; and that the entire claim and theory of appellant and his counsel in all the proceedings during that ten-year period was only that he had been denied his constitutional rights, in that he was not represented by counsel at the time of his arraignment. In this regard, Judge Spier said that neither the Constitution nor the decisions of the Supreme Court requires that counsel be appointed in every case, when not requested; that appellant had every opportunity to make such a request; that there was no denial of this right; that the court knew, and the record showed that appellant knew what he was doing when he pleaded guilty; and that he knew the possible consequence of his plea.

Accordingly, Judge Spier found that appellant had not pleaded guilty as a result of fear or intimidation; that the plea of guilty was voluntarily made; that the court was satisfied that the defendant was guilty of the offense charged; and that he pleaded guilty because of that fact.

As above mentioned, after entry of the order denying the motion for new trial, appellant filed, with the Michigan Supreme Court, application for leave to appeal, which that court denied. Appellant then filed application for a writ of certiorari to the United States Supreme Court, and while that application was pending, the Supreme Court of Michigan, on motion of the Attorney General of that state, set aside its order denying leave to appeal, and remanded the case to the court below for the purpose of taking testimony in the trial court from witnesses who might have knowledge of the truth or falsity of appellant's assertions.

### Hearing on Remand.

On December 28 and 29, 1953, the testimony of all witnesses desired by either the appellant or the prosecution was taken in open court. Appellant was present with his counsel at all times, and unlimited cross examination was accorded appellant's counsel. Appellant himself took the witness stand; and the prosecuting attorney confined his cross examination to the sole issue of appellant's claim that his plea of guilty was induced by fear and intimidation. The court found that there was obvious falsity in some of the basic allegations in appellant's affidavit; that, for instance, appellant's claim of a lengthy interrogation and threats while in the court room to get him to confess was false—he had already signed a confession in jail; that the claim that there was "a mob in the street below" was false; and that appellant's claim that he was led through the tunnel was false—there was no tunnel. The court further considered other claims of appellant: that he had denied to the officers that he was guilty of any crime; that he had been told there was a mob outside the jail; that there had been threats to turn him loose to the mob, if he did not confess; that his requests to see his brother, or other members of his family, while in the court room; and that he had been taken to a court room window by an officer and shown a mob, or a large number of people on the street, some of them looking up in his direction. Every one of these allegations, said the court, had been denied by several witnesses under oath. Sergeant Campbell also testified that he heard Chief of Police Rosso ask appellant if he had an attorney or wanted one, and that appellant replied no, that he would like to get it over with as soon as possible. It is not necessary to augment the details of all the facts and circumstances. The trial court observed that appellant had just procured a job in the tavern. "If he were innocent of any wrongdoing that night, why did he not return to that job and keep up his contact with his newly found and willing (as he claims) sexual outlet? Is it not more logical to assume that, having assaulted, and had intercourse with a married woman, he disappeared for a few days, banking on the possibility that the victim would not want to face the disgrace and publicity of making a criminal complaint, which frequently happens, especially in the case of a married woman with children; and that when he found she had made a complaint, he gave himself up, and, as he said, 'wanted to get it over with as soon as possible?' "

However, the trial court recognized that "there are certain features of the case requiring the closest scrutiny of all testimony of all parties. Those are the rapidity of the disposition of the matter, and the calling of a night session of the court." But, the court went on, as to the actual arraignment, there was nothing hasty; the appellant had been examined at length in an atmosphere and surroundings that were quiet and free from any tension or antagonism and questioned by a judge who did all he could to make sure the defendant knew what he was doing and what he wanted to do. The trial court, after the remand, denied the motion for a new trial.

### Appeal.

On leave granted, appeal was taken from the denial of the new trial to the Supreme Court of Michigan, which, in a comprehensive opinion by Mr. Justice Boyles, speaking for a unanimous court, held that the record left no room for doubt that appellant was guilty of the crime of rape to which he had pleaded guilty ten years before; that the claim that he was induced to plead guilty by coercion and fear was not supported by the record; that the fact that there had been such a speedy trial did not establish that justice required that appellant be given a new trial; and that appellant, having pleaded guilty, was not entitled, under the Constitution, to a trial to determine his guilt, since his plea of guilty was not refused, or set aside, by the trial court. The order denying the motion for a new trial was, accordingly, affirmed. 343 Mich. 465, 72 N.W.2d 177.

A petition to the United States Supreme Court for a writ of certiorari was subsequently denied. 351 U.S. 967, 76 S.Ct. 1033, 100 L.Ed. 1487.

## Habeas Corpus.

In his petition in the district court for a writ of habeas corpus, appellant alleged that his detention was in contravention of the United States Constitution in that his confession was induced by fear of mob violence; that he was denied a public trial; and that he was denied the right to counsel.

After discussing all of the various state court proceedings, and the decision of the Supreme Court of Michigan in the case, the district court, in its conclusions of law, held that appellant's claim that his confession was induced by fear of mob violence had been given full and fair consideration by the state courts, and no sound reason had been advanced why the district court should not accept the state court's determination that this claim was false, citing Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469. The court further held that, while it was admittedly unusual for court proceedings to be held at 10:00 p. m., it appeared that the court house and court room were open for any spectators that had wanted to attend, and that receiving appellant's plea of guilty at that time did not introduce such an element of unfairness into the proceedings as to justify voiding the sentence. With regard to the fairness of proceedings without counsel for a party, in noncapital cases, that, said the court, depended on the circumstances of the case, the most important of which was the ability of the accused to understand the charges against him and the consequences of his plea of guilty without the aid of counsel; and the court held that the record of the case affirmatively shows that the petitioner understood the charge made against him, and that he could be sentenced to life imprisonment on his plea of guilty.

In conclusion, the district court held that the petitioner had failed to sustain the burden of proving such a disregard of fundamental fairness in the imposition of punishment by the state as would justify a federal court's invalidating the sentence by reason of the due process clause, citing Quicksall v. People of State of Michigan, 339 U.S. 660, 70 S.Ct. 910, 94 L.Ed. 1188, and Brown v. Allen, supra; and the court denied the writ.

■ Appellant claims that while the fear of mob violence motivated the police and prosecutor in the "lightning rapidity" with which they expedited the proceedings, *Judge Spier had "a different motivation—concern that the Appellant might obtain counsel, change his plea, and request a trial."* In the argument before this court, appellant's counsel stressed, more than any other consideration, this claimed motivation of Judge Spier—that the case was rushed through to keep appellant from obtaining counsel, changing his plea, and requesting a trial. This claim is based upon a statement Judge Spier made during the oral argument on the motion for a new trial, before remand by the Michigan Supreme Court. We are of the view that this contention is based upon a misreading of an excerpt of Judge Spier's comment at that time, and appears to be an unjustified reflection upon the judicial competence and character, as well as the humane concern, of the judge for this accused man. A reading of the judge's observations during the oral argument is convincing that the judge was not motivated by any consideration of preventing appellant from obtaining counsel, changing his plea, and having a trial.

Because of the paramount importance attached by appellant's counsel, to the trial judge's observations as disclosing the alleged motivation of the judge to prevent appellant from obtaining counsel, and, in order to place the matter in its proper perspective, which indicates the true concern of the trial judge that appellant should know what he was charged with, and that the court should be certain his plea was voluntary, a more extensive part of the judge's observations during the oral argument for a new trial—in-

cluding the excerpt relied upon by appellant—is set forth in the margin.[2]

Appellant stresses, as one of his principal points indicating that he was

2. During the argument on the motion for a new trial, Judge Spier made the following observations:

"I should make some statement here in respect to the practice that used to exist some ten to twenty years ago and previous, the practice that still continues, I think counsel will find, in many rural areas, holding court at any hour of the day or night at convenience of the public officials, witnesses, parties interested, and that was the practice in this circuit until I doubt if it happened within the past eight or ten years. This is ten years ago this happened. I think we are fairly safe in saying that is about the time the practice ceased. It is not to be commended in criminal cases. I think those of us engaged in judicial work have frowned upon it and through our practice and conclusions because of the fact in some instances it did result in injustice, resulted in the adoption of court rules which now practically stop this objection of so-called speedy justice.

"The court rules now outline the proceeding to be followed and they also prescribe that before sentence the defendant should be referred to the probation department. In other words, we are constantly putting safeguards around anyone accused of an offense to insure fair and impartial consideration under any and every circumstance. I think I can safely say that perhaps the most difficult work of any judicial officer, the thing that causes him to lie awake nights, is the worry and fear that in some moment of haste or inadvertence there may be an injustice committed, particularly in a criminal case where the liberty of an individual is involved. For that reason I think that every court should exhaust every means at hand to ascertain that the party brought before him knows what he is doing and understands the nature of the charge against him, and that he enters any plea of guilty freely and voluntarily, without any intimidation or force. That certainly has been the practice of the courts in this circuit.

"As I say, some ten years ago or better this practice of entertaining pleas of guilty during the evening hours was not infrequent, although no longer practiced. Now, the purpose back of that was purely one of disposing of the case promptly; secondly, for the reason that it is a known fact that a party arrested and accused, associating over in jail any length of time with more experienced criminals, very often was talked into fighting the case regardless whether he was guilty or innocent, and very often advised that it cost him nothing to put up a fight, why plead guilty, the state will appoint an attorney. It resulted in many times trials that resulted in the same net expense, except it was at considerable more expense to the taxpayers and no injustice to our knowledge was incurred other than—well, I can't say * * * no, because there have been cases before me that I have set aside pleas of guilty because I was satisfied that the respondent did not know his full rights, he had not had experience before, or for some reason I was not satisfied that the plea was free and voluntary.

"It happens every year. I recall certainly not less than two years ago one Negro boy case that was remedied. I think any court will be quick to set aside a plea of guilty and sentence where the court feels there is any question about the voluntariness of such a plea, but back in those years at the request of the prosecutor or state police, it was occasionally resorted to—we have someone who has confessed, has waived examination, and they want to dispose of it, before he changed his mind. That is, frankly, the situation that used to exist. There were occasions then when the Court was opened, the building was opened, the elevators were running, the public had access to the courtroom, the parties would be openly brought across and arraigned, if they were not out on bond, and arraignment and plea entered and record made here.

"That apparently was done in this case, the unusual feature being that he had only been arrested that same afternoon apparently. Now, counsel is correct in saying that is a circumstance to be carefully considered in determining whether or not the plea was a free and voluntary one. Counsel is correct on the other points he has raised. We have no quarrel whatever with any of the law counsel cited. He is correct, and I will say counsel very ably presented the picture in taking advantage of every point that apparently could be raised in this case.

"Counsel is absolutely correct in saying that had there been the least intimation there was a mob or threats made that the court should not have accepted such a plea. There apparently is nothing in the record or anything about any mob or crowd or group or threats made against the defendant, only his own affidavit now made ten years later, but somewhere along the line apparently subse-

wrongfully denied counsel, the fact that, upon the remand by the Michigan Supreme Court to the Circuit Court of the motion for a new trial, he testified, on arraignment before the Justice of the Peace, that he asked the Justice "why they wouldn't let me call my brother and why wasn't it possible to have an attorney," and that, to this plea, the Justice's only answer was that there was nothing he could do and that his hands were tied; and that this testimony of appellant was uncontradicted by the Justice or by the assistant prosecutor who was present. At the hearing, as previously stated, the testimony of all witnesses desired by either the appellant or the prosecution was introduced, and unlimited cross-examination was accorded by the Court to both parties. Neither the Justice of the Peace nor the former Assistant Prosecutor was called as a witness by either party. But the testimony of appellant that the Justice of the Peace stated that

quent to the other motion for a new trial there must have been some intimation made to the court because there was some inquiry made and at that time the court was informed that there was no truth of the mob story insofar as any mob was concerned, that there were six or seven people, curiosity seekers, around the jail, such as would normally be found where there had been an arrest and police cars come in with someone under arrest. There was no undue commotion or 'unusual crowd.' That is not to say this defendant might not be informed there was, but from the factual standpoint the court was informed at that time. I do not understand why there is not some affidavit in that respect in the record but we will have to take the record as it is. We have only the mob article. We are bound to take the point that newspaper writers are bound to seize upon the spectacular and prone to exaggerate for the purpose of making a story sometimes. That standing all by itself, the newspaper article, would certainly not justify granting a new trial.

"Another circumstance which we should consider carefully is the fact that this respondent filed—and obviously with the help of somebody because he certainly had help and advice in order to prepare— the pages are not even numbered, but there are obviously some 30 pages of typewriting in very legal language—counsel has probably perused it—he had some assistance in filing a motion which was heard here in 1948, February, and at that time, even though apparently counsel who argued the motion did not prepare the motion, he had full opportunity, of course, and presumably did, interview the respondent, covered the motion, and, with a reputation as capable attorneys, firm well known, most presumably have taken advantage of every angle, every then existing reason for seeking a new trial.

"Now, there is no point in any of those papers filed or in the argument was the claim made by the defendant—that was back in 1948 or 1947 when it was filed— that would be about five years after the offense—at no time did he make any claim then that the plea was not voluntary or that it was made by reason of any force or intimidation. The main issue was he was not accorded counsel which was guaranteed him under the Constitution. It is significant that he did not at any time up to that point deny he was guilty. He merely stated he was not accorded his rights in having counsel. That point was clearly argued. Every other point raised, none of them included this question of intimidation or this mob question.

"The Court gave it very careful consideration, great many hours spent in studying the case and lengthy opinion filed. Still there was no claim of any force or intimidation."

In his opinion denying the motion for a new trial, after remand by the Michigan Supreme Court, Judge Spier said:

"This type of problem is a source of great concern and worry, to the trial judge. He accepts the defendant at face value as he appears before the court. If he appears ill at ease, or worried, or frightened, his statements are not accepted without serious questioning, or further investigation. However, when the defendant, as in this case, has been through the similar court proceedings before, and has asserted and been given his rights, and has every appearance of knowing what he is doing and wants to do, and indicates freedom of thought by denying certain details and correcting the court in others, the judge naturally places more reliance upon the defendant's own representations, appearance and statements. When under such circumstances the defendant tells the court: 'I wouldn't change my plea because I know I am guilty; no use trying to run around— trying to fight it', the court believes him, unless there is something to indicate to the court to the contrary."

"his hands were tied" and that he could do nothing about letting appellant call his brother, or secure an attorney, was strongly rebutted by other testimony on the part of the prosecution.

In his affidavit for a new trial, appellant swore that, as far as he knew, he was not even arraigned before the Justice of the Peace, "nor was he asked to waive an examination, nor did he do so," although he testified that he knew the Justice in question personally. The return to the Circuit Court of Frank E. Jeannette, the Justice of the Peace, shows that appellant was brought before him, that the charge of the crime was distinctly read to him, and that he thereupon expressly waived an examination before the Justice, as to the matters charged in the complaint and warrant. While, in his affidavit for a new trial, appellant stated he was not arraigned and did not waive an examination, he did not, in his subsequent testimony, mention any claim that he was not arraigned, or that he did not waive examination; and, therefore, it appears from the record of arraignment, and from the testimony of other witnesses, that the statements in appellant's affidavit that he was not arraigned before a Justice of the Peace, and that he did not waive examination were without any foundation.

■ During appellant's examination as a witness on the hearing of the motion for a new trial, after remand, he was questioned as to whom he asked, during the course of the evening, for permission to get in touch with his brother, and his answer was: "I just made my appeal in general to anybody when I was in the office and they wouldn't listen. Several times, it wasn't done once, several times."

Sergeant Stanley Campbell and Sergeant Eugene Smith, the police officers who brought appellant from the State Police barracks to Mount Clemens testified that appellant freely admitted the rape to them on the trip to Mount Clemens, and told them he wanted to get it over as soon as possible. Campbell testified that when appellant was first put in his cell, Chief of Police Rosso asked him if he had an attorney, or wanted an attorney, and that he said, "No, he would like to get it over as soon as possible." Chief Rosso's testimony was not available, in this regard, as he had died before the last hearing. Sergeant Campbell's testimony that appellant said he did not want an attorney was uncontradicted. Sergeant Smith testified that appellant had freely told what had happened; that he made no denial; and that his admission of what had taken place was so close to what had been told by the young woman who had made the complaint against him of rape that there was no need of further investigation in the matter. "We were satisfied, because of the two stories coinciding as they did, that Mr. Henderson was telling us the truth when he made this admission." When Sergeant Smith was asked whether appellant was interrogated by police, detectives, and officials in the court room, before Judge Spier took the bench, in an effort to obtain from his confession of the crime, as appellant had claimed in his affidavit, Sergeant Smith answered that no such interrogation was made; that he and Sergeant Campbell were sitting in the court room on either side of appellant, "and because of the fact, as I have already told you, that he willingly told us the entire story, there was nothing further to question him about." As to appellant's claim that officers continued their efforts to obtain a confession from appellant in the court room before Judge Spier arrived, this appears incredible since appellant had already signed a confession prior to the time he was arraigned before the Justice of the Peace. Both Sergeant Campbell and Sergeant Smith testified that they were in the jail, while appellant was there, and were so placed that they knew who was talking with him; that no one threatened appellant with respect to a mob, or told him about any mob, contrary to appellant's claim in his affidavit and in his testimony; that appellant never asked permission to call anybody, or to get in touch with anybody; that he never said he was not guilty; that he said he was

guilty; and wanted to get it over as soon as possible.

There is no evidence that anyone said anything to appellant about a mob, except his own statement; and appellant's testimony in this regard, was denied under oath by several witnesses. An attempt was made to attribute statements, intimidating appellant, to Chief Rosso, who died five years after appellant's plea of guilty. No charge however, was actually made that Mr. Rosso had ever, in any way, intimidated appellant or had ever mentioned anything to him about taking precautions against demonstrations by angered citizens. It does appear that Chief Rosso, because of the nature of the case did consider that precautions should be taken; but appellant knew nothing about this at the time of his plea of guilty, or for a long time afterwards. But all of the claim of mob action appears to have subsequently taken form as a result of appellant's learning of certain newspaper articles after he had been sent to prison. In the articles, Chief of Police Rosso was quoted as saying that half a dozen men, neighbors of the woman who was attacked, visited the jail the night of July 30, 1942, threatening to avenge the crime. Appellant was arrested five days later, and a news story was carried "rehashing," as the court said, "the previous story * * and again referring vaguely to 'rumblings indicated possible violence from incensed Harrison Township acquaintances.'" Neither of these articles came to appellant's attention prior to his plea of guilty. The trial court referred to them by saying that "We are bound to take the point that newspaper writers are bound to seize upon the spectacular and prone to exaggerate for the purpose of making a story sometimes." The court further said: "There is every indication that the claim of threats was an afterthought and inspired by the newspaper articles, which were all based on one conversation some neighbors allegedly had with the Chief of Police, now deceased, on the night of the offense, and this was some six days prior to defend-

ant's arrest and arraignment. All testimony clearly shows there were no untoward incidents of tension or unusual conditions or gatherings on the night of August 5, 1942," (the night appellant pleaded guilty). Further, the court said: "The news article in no way intimates the existence or imminence of any mob or even curious group. The affidavits of the officers also show no mob existed." And in his observations, during the argument of the motion for a new trial, the judge remarked: "That standing all by itself, the newspaper article, would certainly not justify granting a new trial."

In this case, the Michigan courts did not believe appellant's allegations that he had not been allowed to communicate with his family, his friends, or a lawyer, and that his confession and plea of guilty had been induced by fear of mob violence; and appellant's testimony was disbelieved by the tribunal especially qualified to sit in judgment on his credibility. His claim that he had been brought through a tunnel between the jail and the court house while a mob surrounded the court house was proved to be entirely false—and was finally admitted to be, since there was no tunnel. His claim that he looked through the window of the court room and saw the crowd below was proved to be false, since it was impossible to see the street below from the window because of stone abutments. His claim that police officers rigorously questioned him to secure a confession while he was in the court room before Judge Spier opened court, seems unbelievable since he had already signed a confession before he had been arraigned before the Justice of the Peace. Opposed to his claim that he had repeatedly asked to see his relatives and a lawyer is the testimony of the officers that, when they first went to bring him to Mount Clemens after he had surrendered to the authorities, he had freely admitted the crime, and later told the Chief of Police that he did not want a lawyer but wanted to get the matter over with as soon as possible. The examination of appellant by Judge

Spier in open court, the absence of tension or antagonism during the proceeding, the detailed questioning by the judge, in quiet surroundings, in an effort to find the true facts, the denial by appellant of certain details, and correcting other details, of his story, the statement by appellant that he would not change his plea, even if it resulted in a life sentence, because he knew he was guilty, all contribute to give his answers during the examination the imprint of truth, and negate coercion and intimidation.

Appellant's explanation why he failed to return to his job after one day of work, as well as his explanation why he left the state for several days immediately after the claimed crime, undermine his credibility as a witness from still another aspect, in addition to his claim that he came through a tunnel, and that he had seen a mob as he looked from the court room window.

It is to be recalled that the girl who filed the charge of rape against appellant was a young, white, married woman, living with her husband, and with a child four years old. She had never seen appellant until the night when she was asked by her employer to drive appellant to his place so that he could pick up his clothes there, and then return him to the tavern. Appellant himself stated that he had never seen the girl before, did not know who she was, and had not even heard of her previously. Appellant was a man twenty-five years old, who had been married, but was not living with his wife. He had previously been arrested in Cleveland when he had intercourse with a girl under age, but was released because the girl was in a disorderly house. He had had syphilis. He had been convicted of robbery unarmed, and served more than a year and a half in prison. The first time, appellant says, that he thought of having intercourse with the girl, in this case, was after she had started to drive him from the tavern to his home to get his clothes that night. He had intercourse with her, in a matter of minutes after they left the tavern, which the girl charged was a rape, and

which appellant, ten years later, claimed, for the first time, was voluntary on her part. The last of the two occasions he had intercourse with her was just past midnight, on a lonely road in the country. Later, on the same day, the girl filed the criminal charge that appellant had criminally assaulted and raped her.

When appellant, on the hearing of the motion for a new trial, was asked the reason why he had disappeared that night and left the state, and why he had not returned to his job at the tavern, he gave this explanation: "Well, after having relations with this girl, *she got afraid she would talk to her husband* or somebody, and would come out, and would be some trouble, and she *didn't think I should stay around, so having concern for herself* and myself also, I decided *the best thing maybe was to leave.*"

The conclusion that appellant's credibility was worthless appears inescapable, from this testimony, and from his testimony that his plea of guilty was induced by the fear of a mob which he saw gathered at the court house. The state court disbelieved appellant's claims, after giving them full and fair consideration. Since no sound reason was advanced why the district court should not accept the state court's determination that appellant's claims were false, the district court's conclusion in this regard should be sustained on the authority of Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469.

No request was made by appellant to Judge Spier for legal counsel.

In Quicksall v. People of State of Michigan, 339 U.S. 660, 665, 70 S.Ct. 910, 913, 94 L.Ed. 1188, in a somewhat similar case, involving, however, a plea of guilty to a charge of murder, Mr. Justice Frankfurter, speaking for the court, said:

"Petitioner makes no claim that he did not know of his right to be assisted by counsel, see Mich.Stat.Ann. § 28.854 (Henderson 1938), Comp. Laws 1948, § 763.1 and in view of his 'intelligence, his age, and his earlier experiences in court,' the

Supreme Court of Michigan rejected the notion that he was not aware of his right to be represented by an attorney. 322 Mich. 351 at page 355, 33 N.W.2d 904, at page 906. Cf. Gryger v. Burke, 334 U.S. 728, 730, 68 S.Ct. 1256, 1257, 92 L.Ed. 1683. Since the Michigan courts disbelieved petitioner's allegations that he had not been allowed to communicate with his family, his friends or a lawyer, and no request was made by him for legal aid, the only question is whether, in the circumstances of this case, the failure of the record to show that he was offered counsel offends the Due Process Clause.

"At least 'when a crime subject to capital punishment is not involved, each case depends on its own facts.' Uveges v. Commonwealth of Pennsylvania, 335 U.S. 437, 441, 69 S.Ct. 184, 186, 93 L.Ed. 127; Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595. To invalidate a plea of guilty the prisoner must establish that 'for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in his confinement.' Foster v. People of State of Illinois, 332 U.S. 134, 137, 67 S.Ct. 1716, 1718, 91 L.Ed. 1955; see Gibbs v. Burke, 337 U.S. 773, 781, 69 S.Ct. 1247, 1251, 93 L.Ed. 1686. Here petitioner's claim * * * was disbelieved by the tribunal especially qualified to sit in judgment upon its credibility. See Wade v. Mayo, 334 U.S. 672, 683–684, 68 S.Ct. 1270, 1275–1276, 92 L.Ed. 1647. In the light of what emerged in this proceeding upon a scrutiny of what took place before the same judge ten years earlier, when petitioner's plea of guilty was tendered and accepted, it would stultify the Due Process Clause to find that any right of the petitioner was infringed by the sentence which he incurred. Foster v. People of State of Illinois, supra, 332 U.S. at page 138, 67 S.Ct. at page 718; Bute v. People of State of Illinois, 333 U.S. 640, 670–674, 68 S.Ct. 763, 778–780, 92 L.Ed. 986.'"

■ In the Quicksall case, as appears, appellant therein, at the time he pleaded guilty, had not requested counsel, and the court did not offer to appoint counsel for him. Appellant in the instant case, as in the Quicksall case, made no claim that he did not know of his right to be assisted by counsel. As the trial court found, he was familiar with criminal proceedings. He had been arrested in Cleveland, in connection with the underage girl. "He had been arrested in Recorder's Court, Detroit, pleaded guilty to robbery unarmed, changed his plea to not guilty, then upon the state furnishing him with a lawyer, who consulted with him in jail, he pleaded guilty on his lawyer's advice," and served a term in prison. From the decision in the Quicksall case, it appears that where an accused is not offered legal counsel, he must establish, in order to invalidate a plea of guilty, that because of lack of counsel, an ingredient of unfairness actively operated in the process that resulted in his being sent to prison. In the instant case, the district court held that appellant had failed to establish such a disregard of fundamental fairness in the process that resulted in his imprisonment by the state, as would justify the district court in invalidating the sentence by reason of the due process clause of the United States Constitution.

Appellant relies on De Meerleer v. People of State of Michigan, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584, in which it was held that, under the circumstances of that case, a sentence to life imprisonment on a plea of guilty, entered without benefit of counsel, was a denial of due process. In that case, the defendant, who was a boy seventeen years old, of limited education, being confronted with a serious criminal charge, was hurried through unfamiliar legal proceedings, and the court did not explain to him the consequences of his plea of guilty. None of those circumstances are present in the instant case.

Since the argument of this case, our attention has been directed by counsel for appellant to the recent case of Moore v. State of Michigan, 355 U.S. 155, 78 S.Ct. 191, 195, 2 L.Ed.2d 167. There the defendant in a case in which he was charged with rape and murder was offered counsel by the court, but refused the offer, and pleaded guilty. After serving twelve years of a life sentence, he made application for leave to file a delayed motion for a new trial, which was denied by the state trial court, and the state Supreme Court affirmed. On certiorari to the United States Supreme Court, the judgment was reversed, and the case remanded for further proceedings, in a five to four opinion. In the prevailing opinion, the court held that the defendant was denied due process, inasmuch as he did not intelligently and understandingly waive his right to counsel, and that the trial court should have appointed counsel for him in spite of his disavowal of a desire to have such counsel, and the circumstances of the case compelled the conclusion that the defendant's rights could not have been fairly protected without the assistance of counsel.

In the Moore case, the court pointed out that the defendant, at the time of his plea of guilty, was seventeen years of age, and had a seventh grade education; that the record showed possible defenses which might reasonably have been asserted at trial, but that the extent of their availability raised questions of considerable technical difficulty obviously beyond the defendant's power to comprehend; that one of these possible defenses, shown by the record, was insanity, and another such defense, shown by the record, was mistaken identity; that the proceedings to determine the *degree* of murder, the outcome of which determined the extent of punishment, introduced their own complexities, and that with the aid of counsel, the defendant might have done much to establish facts and make arguments which would have mitigated the sentence. The court went on to say that the defendant developed evidence at the hearing on the delayed motion for a new trial "which sustained his burden" of showing that the disavowal of a desire for counsel was not intelligently and understandingly made, and was not a waiver; that this evidence was not known to the trial judge who sentenced him, and was brought out on cross-examination of the county sheriff on the hearing of the delayed motion, and concerned conversation between the sheriff and defendant before the petitioner confessed to having committed the crime. In this regard, the sheriff testified that he had told defendant that if he was guilty, "he might better own up on it because I says there could be trouble. Tension is very high outside, and there could be trouble." The sheriff testified he told him that if he was not guilty, "I would stand pat forever after." He further told him that he would have to take him to Municipal Court for his arraignment, and then back again; that he would be entitled to a hearing in the lower court. He then said that he told the defendant: "It is my duty and it is up to me, to protect you, to use every effort at my command to protect you, but I says, 'the tension is high out there and I am just telling you what could happen if it was started by someone' * * * what I was putting over to him was the fact that if you are guilty and will be sent away, you might better be getting away before trouble, because I had had information there was certain colored fellows, a group of them that was going to interfere with me, and also that there was a bunch of Holland fellows going to meet me when I go to Jackson, they would meet me there at Galesburg there, and, therefore, when he was sentenced, I avoided the main route and went way through by Gull Lake and across over in the hills there." Although the trial court rejected defendant's testimony as unworthy of belief, the Supreme Court pointed out that, in this instance, the sheriff corroborated the defendant who testified that the sheriff had told him "that if I didn't plead guilty to this crime, they couldn't protect me, under those conditions, they says, during the

riot they didn't know what people they would do, and that they couldn't protect me." Defendant further testified he pleaded guilty because of this statement of the sheriff, and said: "After the man tell me he couldn't protect me then there was nothing I could do. I was mostly scared than anything else." With regard to the Circuit Court's finding that the sheriff's testimony was insignificant because other evidence showed there was no mob or riotous gathering, and that there was nothing to indicate defendant had been coerced into a false plea, or that he had been placed in fear of insisting upon his constitutional rights, the Supreme Court held that it was of no moment that the situation described to the defendant by the sheriff did not exist, and that expectation of mob violence planted by the sheriff in the mind of the boy raised an inference that his refusal of counsel was motivated to a significant extent by the desire to be removed from the jail at the earliest possible moment. "A rejection of federal constitutional rights," said the court, "motivated by fear cannot, in the circumstances of this case, constitute an intelligent waiver. This conclusion against an intelligent waiver is fortified by the inferences which may be drawn from the age of the petitioner * * *, and the evidence of emotional disturbance * * *."

None of the circumstances deemed controlling by the court in Moore v. State of Michigan, supra, are present in the instant case.

Instead of a seventeen-year-old boy, there is, here, a man twenty-five years of age; instead of a seventh grade education, an eleventh grade education; instead of a possible defense, as disclosed by the record, of insanity, no such evidence; instead of a possible defense, as disclosed by the record, of mistaken identity, an admission of identity, with only the question, in this regard, whether the complaining witness consented to the act; instead of a boy with limited mental capacity, a man "whose self possession, conduct, and demeanor on the stand, showed him," as the trial court stated,

"to be a very intelligent and aggressive personality, keenly alert to his legal rights and defenses, as borne out by his handling of his answers and testimony"; instead of a defendant whose vital testimony was corroborated as truthful by the chief witness for the prosecution, a defendant whose principal statements were demonstrably false; and instead of a defendant who was motivated, to a significant extent, in pleading guilty, by the expectation of mob violence—and the desire to be removed from the jail, and to prison—admittedly planted in his mind by the sheriff, we have, in the instant case, a defendant, all of whose claims of intimidation and inducement of his plea of guilty because of fear of mob violence, are either patently false, or are denied by several witnesses under oath. The circumstance that the Chief of Police, now deceased, was afraid that there might be mob violence, when the appellant was arrested, was never communicated to appellant, according to the testimony of the two officers who were in charge of appellant, and were present whenever the Chief of Police saw him. As the trial judge stated: "False statements by officers to an accused, of threatened or probable mob violence, could readily be held to be sufficient grounds for a new trial, if the accused were intimidated thereby, even though no actual mob ever existed. However, as pointed out, the accused here has destroyed the reliability of his claims of threats or intimidation by falsely swearing to the actual existence of a mob." In view of this record, the trial court was not obliged to accept appellant's uncorroborated testimony that the officers intimidated him and induced him to plead guilty by threats of mob violence, or by communicating such fears to him, in the face of the direct testimony on behalf of the State that there was no such intimidation or communication to him.

One other recent case appears deserving of consideration in this regard. In United States ex rel. Savini v. Jackson, 2 Cir., 1957, 250 F.2d 349, the court had occasion to pass upon the appeal of the

respondent from an order of the district court granting a writ of habeas corpus on the petition of Savini, who had been sentenced by the New York state court under the state Multiple Offender Law, Penal Law, McKinney's Consol.Laws, c. 40, § 1941, as a second offender. The first offense claimed had resulted in petitioner's conviction of rape in a state court in Michigan. Thereafter, in various proceedings, he had attempted to review the validity of the conviction, variously, by petitions for writs of error coram nobis, which were denied. On appeal, the Supreme Court of Michigan had vacated the last order denying his petition for a writ of error coram nobis, and directed a hearing, and remanded it to the lower court for a hearing, if and when Savini found it possible to be present in open court. He was, however, then imprisoned in New York and could not arrange for such required presence. He thereafter filed a petition for a writ of habeas corpus in the District Court for the Northern District of New York, in which the court, after finding that appellant had exhausted his state court remedies, took jurisdiction of the case, and granted the writ.

The factual background was as follows: Savini, the petitioner for the writ, was a man twenty-one years old, married, and a private in the United States Army, on duty at Fort Custer at the time of the claimed offense. He was arrested on a charge of rape, and after a night in solitary confinement, was arraigned the next morning. When, on his arraignment, an information was read charging him with rape, he immediately pleaded guilty. In answer to questions from the court, he stated his plea was given without inducement by promise of leniency, or by coercion. After an interview with the judge in his chambers, Savini was immediately thereafter sentenced to a prison term of from seven and a half to fifteen years. He had never been advised that he was entitled to counsel—and did not have counsel. On the hearing of the petition for the writ of habeas corpus in the district court in New York, he testified, without contradiction, that, at the time of the alleged offense, both the prosecutrix, whom he had met for the first time on the date of the offense, and he himself were intoxicated; that, at his arraignment, he was scared and confused; that he never understood the implications of the charge, and the consequences of his plea of guilty; that although he could not deny he had committed the offense, he did not actually know that he was guilty either. He had not been advised what could be a defense to the charge, which, among others, was that specific intent might be negatived by proof of voluntary intoxication.

The district court found that, in the Michigan case, Savini had failed to understand and appreciate the gravity of the offense charged; that he was unaware of his right to be represented by counsel; and that he was ignorant of the consequences of his plea.

■ The Savini case is distinguishable in all important aspects from the instant case. In the Savini case, the uncontradicted and unimpeached evidence, on the hearing, showed that the petitioner had a defense to the charge, and that he did not know it; that he did not know he could have had counsel, and did not know what might be the consequences of a plea of guilty. The evidence in the instant case shows that, according to appellant, he knew he did have a defense but did not assert it because of fear—although his present claimed defense is impeached by overwhelming evidence. The evidence further shows that he knew he was entitled to counsel; and that he knew of the consequences of his plea of guilty. In the Savini case, the court granted the writ on the ground that the circumstances were such as to lead to the conclusion that the petitioner was not given the traditional protection afforded persons charged with crime, because of the undisputed proof of ignorance on the part of petitioner as to what constituted the crime charged; because of petitioner's ignorance of his right to counsel; and because of petitioner's ignorance of the consequences of his plea. In the in-

stant case, the district court denied the writ because it concluded that the state court, after full and fair consideration, had found that appellant's confession was not induced by fear of mob violence, and that there was no sound reason advanced why the district court should not accept the state court's determination that appellant's claim that his confession had been so induced, was false; that the record showed appellant understood the charge against him and the consequences of his plea; and that, subsequent to his confession and plea of guilty, appellant had failed to sustain the burden of proving such a disregard of fairness as would justify a federal court invalidating the state court's sentence, by reason of the due process clause.

We have heretofore stated our concurrence in the reasons given by the district court for denial of the writ.

There remains for discussion and comment, the arguments most strongly emphasized by appellant with regard to the speed with which the criminal proceedings were conducted, and the failure of the trial court to appoint counsel.

It is argued by appellant that the speed of the proceedings was due to fear of possible mob violence; that this fear was communicated to the two officers guarding appellant; that it was also communicated to one of the assistant prosecuting attorneys; and that it was further communicated to a newspaper reporter. Yet the Michigan courts found, upon substantial evidence after a full hearing, that appellant's testimony that he had been told of, or was aware of such possible mob violence, was false. The district court accepted such finding, and as pointed out in the accompanying opinion, this court also properly accepts such finding. In sum, there is before us for determination no question of appellant's pleading guilty because of being intimidated by fear of mob violence. He was not so intimidated.

In conclusion, there is only the final argument to be considered—whether the failure of the trial court to appoint counsel for appellant in this case

resulted in his conviction, and was, therefore, so unfair to him that it constituted a denial of due process of law. We are agreed that due process does not require that counsel be made available to defendants in a criminal prosecution, except in certain cases. It is only when, because a defendant does not have the benefit of counsel, and an ingredient of unfairness actively operates in the process resulting in his conviction, that there is a denial of due process. Clearly, there is no rule which requires the appointment of counsel for indigent defendants in all criminal cases in state courts. Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. As said in that opinion, failure to have counsel or denial of counsel is not automatically lack of due process. The question is to be tested by an appraisal of the totality of facts in a given case. "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial" (316 U.S. at page 462, 62 S.Ct. at page 1256).

The cases have referred to circumstances which make the failure to appoint counsel constitute lack of due process. In Betts v. Brady, supra, the opinion refers to the situation where the defendant is unable to employ counsel and is incapable adequately of making his own defense "because of ignorance, feeble-mindedness, illiteracy, or the like" (316 U.S. at page 463, 62 S.Ct. at page 1257). In Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647, it is said that there are some individuals who, by reason of age, ignorance or mental capacity, are incapable of representing themselves adequately in a prosecution of a relatively simple nature and that where such incapacity is present, the refusal to appoint counsel is a denial of due process (334 U.S. at page 684, 68 S.Ct. at page 1276).

The case before us ultimately boils down to the question, whether by reason of such disability the trial court should have appointed counsel to represent ap-

pellant, even though he did not request it. On this issue, some statements made in Wade v. Mayo, supra, seem particularly pertinent. It is there said that this incapacity is purely personal and can be determined only by an examination and observation of the individual; and the court indicates that the finding on this issue is a purely factual one, peculiarly within the province of the trial judge, which finding should be accepted unless clearly erroneous.

In the instant case, the district court pointed out that the important question, in this regard, was the ability of the accused to understand the charges made against him and the consequences of his plea of guilty without the aid of counsel. The court then declared that the record of the case affirmatively showed that the appellant understood the charge made against him and that he could be sentenced to life imprisonment on his plea of guilty. This finding, in our opinion, was not clearly erroneous, and is controlling on the issue. Wade v. Mayo, 334 U.S. 672, 683, 684, 68 S.Ct. 1270, 92 L.Ed. 1647.

██ It seems relevant, in the light of appellant's argument, to consider how he could have been helped by court-appointed counsel, and why failure of the court to appoint such counsel was denial of due process. The mere fact that such counsel might have advised appellant to plead not guilty, or to obstruct and delay the prosecution as much as possible, does not justify the conclusion that there was a denial of due process because of failure of the court to appoint counsel; nor does the fact that such counsel might have compelled the complaining witness to submit to cross-examination, result in failure of due process on the ground that such counsel was not appointed.

It is not meant to be suggested that appellant would have been convicted, whether he had counsel or not, and that, therefore, the question of counsel is unimportant. On the contrary, what is to be emphasized in this regard, is that appellant knew what had been charged with; that he knew that his guilt or in-

nocence depended upon the simple proposition of whether he had forced the girl, or whether she had consented; that, admittedly, appellant was under no fear or intimidation when he stated that he had forced her at knife point to submit to him; and that, assuming, as we must, that he was under no fear or intimidation when he admitted forcing the girl, appellant would not have needed a lawyer to furnish him with advice as to whether he was guilty. It is true that in some cases guilt of a criminal offense depends upon many complicated factors. But not in this case. If he forced her at knife point, he knew that he was guilty; if she consented, he knew that he was innocent. It was that simple.

If appellant was guilty of the crime of rape, he had the right to plead guilty and get it over with, as he said at the time, as soon as possible. It is not unusual for one accused even of a heinous crime to want to plead guilty, voluntarily, and be sentenced at once. The charge in this case was not complicated. Appellant knew whether the act of intercourse was with the girl's consent, in which case he would be innocent, or whether it was by threat of killing her, in which case he would be guilty. The only reason appellant gives for his pleading guilty now, twelve years after, is that he was intimidated into so pleading by threats of mob violence. But that claim has been resolved against him as false. Appellant does not now claim that he did not understand what he was charged with. On the contrary, he did understand what he was charged with. He does not claim that legal counsel would have been able to explain anything more about the charge than he already knew. If appellant was not subjected to intimidation or threats when he told the court that he forced the girl to submit to him by threatening to kill her if she refused, it is difficult to see how legal counsel could have helped him except to tell him not to plead guilty under any circumstances. If appellant knew that he was charged with forcing the girl to submit to him under threat of killing her; if he was not sub-

jected to threats or intimidation by fear of violence, when he pleaded guilty, then, under the record before us, the trial court's finding that his plea of guilty was voluntarily and intelligently made, must be sustained; and if appellant intelligently and voluntarily pleaded guilty, and wished to get the matter over with as soon as possible, then the speed of the proceedings does not require that the conviction be set aside for denial of due process.

A careful reading of the proceedings, both on the original hearing and plea of guilty, and the proceedings on remand, indicate the most careful consideration by the trial judge; and the dispatch, now complained of, does not disclose that the trial judge himself was hurried, precipitous, or prejudiced in his consideration or determination.

During the hearing in open court, at the time of the plea of guilty, appellant gave a detailed circumstantial account of the places where he forced the girl to stop the car, and where, on two different occasions, he forced her, at knife point, to submit to him. His entire claim now is that she willingly consented to the intercourse; and his claim as to her consent is belied and contradicted by the girl's swearing out a warrant charging him with rape, that same day.

Of course, it is not here suggested that it was unnecessary to give appellant an opportunity to consult a lawyer, because he had completed the eleventh grade of school, and was a man twenty-five years old, who had gone through one criminal case with court-appointed counsel. These facts are referred to, as showing that the trial court, the Michigan Supreme Court, and the district court were justified in their view that appellant's plea of guilty was intelligently and voluntarily made. These considerations, upon which the various courts based their determination, were, as heretofore mentioned, strikingly like those which were discussed, and controlled decision, in Quicksall v. People of State of Michigan, 339 U.S. 660, 70 S.Ct. 910, 94 L.Ed. 1188.

Appellant's contention that the government now claims that he did not need a lawyer, since he had completed the eleventh grade in school and was familiar with criminal proceedings, is therefore, seen to be not at all what the government claims. If such were the case, we would be confronted by a high-handed and arbitrary attitude of the government. But that is not this case. In this regard, as above mentioned, the government contends that, as the trial court found (and as is apparent from many parts of the record), appellant was an intelligent and aggressive personality, keenly alive to his legal rights and defenses, as borne out by the handling of his answers and testimony. Counsel may, at times overlook the fact that the trial court has a far better opportunity of judging the character and the intelligence of a witness with regard to his rights and his understanding of the questions asked him, than does an appellate court. The trial court is consequently a better judge, and, in law, the sole judge, of the credibility of such a witness and of the weight to be attached to his testimony; and we would act contrary to the firmly established principles of an appellate court's review of a trial court's findings if we were to ignore its conclusions as to an appellant's demeanor, intelligence and credibility as well as his ability to understand the questions asked him. As far as appellant's statement that his request for counsel was denied, this was not claimed to have occurred before the court in which he pleaded guilty, but before the Justice of the Peace—and, in any event, rests only on appellant's own statement. In this, too, the government's evidence is that, even prior to his appearance before the Justice of the Peace, appellant was asked whether he wished the opportunity to have counsel, and he clearly stated that he did not. If the Michigan trial court, and Supreme Court, as well as the District Court accepted the government's evidence in this regard, it would not seem proper for this court to reject such evidence, and accept, instead,

appellant's testimony that he had always insisted on his right to counsel.

Appellant, in our opinion, has not shown that the trial court's failure to provide him with legal counsel resulted in fundamental unfairness to appellant in the criminal proceedings in the Michigan court.

In accordance with the foregoing, the order of the district court dismissing appellant's petition for a writ of habeas corpus is affirmed on the findings of fact and conclusions of law of Judge Lederle.

STEWART, Circuit Judge (dissenting).

## I.

Late in the afternoon of August 5, 1942, James Henderson learned from a friend that the police of Mount Clemens, Michigan, were looking for him in connection with an alleged rape that had occurred a few days earlier. He went to the office of the State Police, identified himself, and was taken into custody.[1] About 7:30 that evening he was turned over to the Mount Clemens police, and at about 8:30 p. m. was delivered by them to the Mount Clemens jail. Two and a half hours later he had been sentenced to prison for the rest of his life.

The brief period Henderson spent in the Mount Clemens jail was an eventful one. He was registered and fingerprinted. He was taken to the office of the police chief in the jail, where he was questioned by the chief, by his assistant, and by an assistant prosecuting attorney. At about 9:30 P.M. he signed a typewritten confession. Then, arraigned before a justice of the peace who had been summoned to the jail, he waived examination, and on default of bail of $100,000 was ordered held "until the present term of the Circuit Court in and for said County to answer to such information as might be filed against him." The assistant prosecuting attorney next prepared and lodged an information charging Henderson with the crime of rape. Finally, at about 10 o'clock Henderson was taken to the courthouse across the street from the jail.

Court was convened at 10:20 p. m. The information was read, and Henderson pleaded guilty. He was then questioned as to the circumstances of the alleged offense by the same assistant prosecutor who had obtained his confession scarcely an hour earlier. He was also interrogated by the judge. The only others in the courtroom were the police chief, the two police officers in whose custody he had been since 7:30 p. m., another prosecutor, and the court stenographer. At no time during these proceedings in court was Henderson, thus friendless and alone, advised by the judge or by anyone else of a right to counsel, asked if he wanted counsel, offered the assistance of counsel, or given an opportunity to obtain counsel. When the interrogation was concluded the judge imposed sentence. Henderson was then hustled to another jail in a neighboring county where he was held overnight. On the following day he was transferred to the state prison to spend the remainder of his life.

## II.

What was the reason for these speedy proceedings in the dead of night? The motivation seems clearly to have been fear of possible mob violence.[2] The rec-

1. "Q. And did anything arise there which prompted you to go to the state police? A. Mrs. Smith showed me a newspaper article stating that there was a warrant out for me, which alleged the crime of rape, and the state police had been in her house looking for me.

"Q. She told you that? A. Yes.
"Q. So what did you then do? A. I read the article and asked if she believed I had done it and she said no and she asked me what I was going to do and I told her there was nothing else for me but to go down and turn myself in and I told her then, 'I will see you on Friday.'
"Q. Did you go to the state police office? A. Directly.
"Q. How did you go there? A. Walked."

2. The record suggests only one other possible reason for rushing through the proceedings, a reason considerably less commendable. During argument of the motion for a new trial several years

ord shows that this fear was communicated to the two officers charged with guarding Henderson. It was communicated to one of the assistant prosecuting attorneys. It was also communicated to the press, and thereby to the general public.[3]

At the hearing on the motion for a new trial Henderson testified that he too had been told of the authorities' fear of mob violence:

"A. I can't remember all the questions that was asked me. I do know during the course somebody was questioning me somebody would say now and then about hurry up and talk, they are not going to be responsible for me if the mob breaks in, they are not going to lose their lives protecting me."

The Michigan courts have found, however, that this testimony of Henderson's was false, and that the fear of mob violence which pervaded the jail and courtroom on the night he was sentenced was in no way communicated to him. That finding, made upon substantial evidence after a full hearing, was accepted by the district court and must be accepted here.

This was conceded in oral argument by Henderson's counsel. Further discussion of this aspect of the case would therefore be bootless.

### III.

It is upon an issue quite different that my dissent is based. I am convinced that the undisputed circumstances made this a case where the intervention of counsel, unless intelligently waived by Henderson, was an essential element of the due process of law guaranteed by the Fourteenth Amendment of the United States Constitution.

It is of course settled that Due Process does not require that counsel be made available to every defendant in a state criminal proceeding. Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. The principles which determine when it is that federal organic law does require a state to give a criminal defendant in a noncapital case the opportunity to obtain the assistance of a lawyer have been elaborated in many decisions of the Supreme Court. Smith v. O'Grady, 1941, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859; Rice v. Olson, 1945, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367; Canizio v. People of State of New

---

later, the trial judge observed: "* * * As I say, some ten years ago or better this practice of entertaining pleas of guilty during the evening hours was not infrequent, although no longer practiced. Now, the purpose back of that was purely one of disposing of the case promptly; secondly, for the reason that it is a known fact that a party arrested and accused, associating over in jail any length of time with more experienced criminals, very often was talked into fighting the case regardless whether he was guilty or innocent, and very often advised that it cost him nothing to put up a fight, why plead guilty, the State will appoint an attorney."

3. Two days after the alleged attack Mount Clemens' only newspaper had published an article which stated: "Meanwhile, Rosso said that a half-dozen irate Harrison township men—neighbors of the woman—visted the jail last night where they threatened to avenge the crime. 'If you've got that ——— ——— ———, we want him,' Rosso quoted them as saying."

The day after Henderson's arrest and sentence the same newspaper carried an article which stated: "Moving with lightning rapidity to avoid possible mob violence, and at the same time, to mete out swift justice, Mount Clemens courts and law enforcement officers combined late last night to send a 27 year old Negro to prison for the rest of his natural life following his confession to having twice attacked a 26 year old white Harrison township housewife.

"To minimize the possibility of violence the man, James Henderson, was rushed to Pontiac for safe-keeping overnight and was picked up by Macomb County Deputy Sheriffs this morning for transfer to the Southern Michigan Prison at Jackson." * * * "Held [the prosecutor] and Police Chief Arthur I. Rosso, both said that rumblings indicated possible violence from incensed Harrison Township acquaintances of the outraged white woman had prompted them to rush through arraignment and sentence of the confessed attacker."

York, 1946, 327 U.S. 82, 66 S.Ct. 452, 90 L.Ed. 545; De Meerleer v. People of State of Michigan, 1947, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584; Foster v. People of State of Illinois, 1947, 332 U.S. 134, 67 S.Ct. 1716, 91 L.Ed. 1955; Gayes v. State of New York, 1947, 332 U.S. 145, 67 S.Ct. 1711, 91 L.Ed. 1962; Bute v. People of State of Illinois, 1948, 333 U.S. 640, 68 S.Ct. 763, 92 L.Ed. 986; Wade v. Mayo, 1948, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647; Gryger v. Burke, 1948, 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683; Townsend v. Burke, 1948, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690; Uveges v. Commonwealth of Pennsylvania, 1948, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127; Gibbs v. Burke, 1948, 337 U.S. 773, 69 S.Ct. 1247, 93 L.Ed. 1686; Quicksall v. People of State of Michigan, 1950, 339 U.S. 660, 70 S.Ct. 910, 94 L.Ed. 1188; Palmer v. Ashe, 1951, 342 U.S. 134, 72 S.Ct. 191, 96 L.Ed. 154; Chandler v. Fretag, 1954, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4; Massey v. Moore, 1954, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135; Commonwealth of Pennsylvania ex rel. Herman v. Claudy, 1956, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126; Moore v. Michigan, 1957, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167. It must be shown that for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in the defendant's conviction. Foster v. People of State of Illinois, 332 U.S. at page 137, 67 S.Ct. at page 1718; Gibbs v. Burke, 337 U.S. at page 781, 69 S.Ct. at page 1251; Quicksall v. People of State of Michigan, 339 U.S. at page 665, 70 S.Ct. at page 913. Due process requires that counsel be afforded where it is shown that the lack of a lawyer's assistance made the state criminal proceedings so apt to result in injustice as to be fundamentally unfair. Uveges v. Commonwealth of Pennsylvania; Moore v. Michigan; De Meerleer v. People of State of Michigan, all supra.

The mere recital of the headlong succession of events which culminated in the imposition of Michigan's extreme penalty in this case is enough to evoke grave doubt that the fundamentals of due process of law could have been observed without counsel to assist the defendant. A closer inspection of the record is even more revealing. For the record clearly shows that the help of a lawyer was essential to protect Henderson's rights.

The gloss which Michigan decisions have put upon the rape statute of that state has made the question of a defendant's guilt of that offense far from the simple matter that an ignorant layman might be led to believe. United States ex rel. Savini v. Jackson, 2 Cir., 1957, 250 F.2d 349, 353. Thus the Michigan Supreme Court has held that to constitute rape "resistance to the utmost" is an essential element. People v. Geddes, 1942, 301 Mich. 258, 3 N.W.2d 266, 267. It has held that if there has been "consent by the prosecutrix during any part of the act" the offense of rape cannot be committed. Brown v. People, 1877, 36 Mich. 203. In Michigan rape cases the court must, if requested by counsel, instruct the jury on each of the three cognate offenses of rape, assault with intent to commit rape, and simple assault. People v. Jones, 1935, 273 Mich. 430, 263 N.W. 417. Noting these distinctions which the Michigan courts have made, the Court of Appeals for the Second Circuit recently made an observation which applies directly here: "If in contemplation of state law a lay juror, to understand the essentials of the offense charged, needs such instruction, surely the lay accused, under the pressures normally attendant upon arraignment, needed more than the legal language of the formal information as it was read to him in the courtroom in order intelligently to formulate a plea." United States ex rel. Savini v. Jackson, 250 F.2d 349, 353. Cf. Mullreed v. Bannan, D.C.E.D.Mich.1956, 137 F.Supp. 533.

Instead of giving Henderson any intimation of the elements of the crime of which he was charged, and its included cognate offenses, the judge and the assistant prosecutor by a series of leading questions constructed the case against

him. The following interrogation is illustrative:

"Q. Now, James, the first time you had intercourse with her you know she was in fear of her life because of acts and words spoken at that time, is that right? A. That is correct.

"Q. She had no reason to presume other than what you would use violence to get her to have intercourse? A. That is correct.

"Q. She was in fear of her life at that time and that is the reason she submitted to your act? A. Yes."

Moreover, the entire transcript of the proceedings at the night court session reveals that the judge assumed the truth of the statement which had been made by the complaining witness, although she was not present, and although there is nothing to indicate that the judge had ever even seen her. At the very end of the interrogation, and a moment before sentencing the prisoner to life imprisonment, the judge stated: "If her story is true it is even worse than your story here today. There is no reason for doubting her story."

Finally, it is clear from reading the transcript that at the time he entered his plea of guilty Henderson did *not* know that it could result in a life sentence. When this fact was indicated to him late in the proceedings and after his responses to the judge's and prosecutor's leading questions had placed him in a completely irretrievable position, the vital information was imparted in a most tentative and hypothetical way:

"Q. You know it carried a life sentence, do you? A. *I didn't know that, no sir, I didn't know that, sir.*

"Q. Do you have any idea what kind of sentence it carries? A. Somewhat, sir, I have heard of cases, sir.

"Q. What? A. I have heard of several cases, sir.

"Q. The fact it *might* carry a life sentence, that make any difference in your plea of guilty? A. I wouldn't

change my plea because I know I am guilty; no use trying to run around —trying to fight it."

This record thus convinces me that the absence of counsel operated to deny Henderson the elements of due process of law under the circumstances of this case. Had a lawyer been available to assist Henderson, he first of all could have forestalled the precipitous haste of the proceedings. He could have investigated the prosecuting witness and checked her story against the surrounding circumstances. He could have investigated the possibility that, if not completely innocent, Henderson was not guilty of rape, but of a lesser included offense under Michigan law. He could have unequivocally explained to Henderson the significance and consequences of a guilty plea. He could have seen to it, that any hope for Henderson was not demolished by leading questions.

### IV.

A suggestion which seems to pervade the majority opinion, unless I have missed the point, is that even if counsel had been provided, Henderson would after all probably have been convicted anyway. The complete answer to that suggestion, if suggestion it is, is well expressed in the recent words of Circuit Judge Pope: "It is my interpretation of the decisions of the Supreme Court that it will not compromise with a denial of a constitutional right. Thus it is inconceivable to me that that Court would listen to an argument that although the accused had been improperly denied his right to assistance of counsel, yet the evidence of the defendant's guilt was so overwhelming that counsel could not have done him any good; * * * When a defendant has been denied due process, his guilt or innocence is irrelevant. He has not been tried by civilized standards, and cannot be punished until he has been." Riser v. Teets, 9 Cir., 1958, 253 F.2d 844, at 847 (dissenting opinion).

The point has also been made throughout the post conviction proceedings, state and federal, that Henderson was no doubt

completely aware of his legal rights and defenses because he had gone through the eleventh grade in an orphan's school, was twenty-five years old, and "was familiar with criminal proceedings." In the light of the record this reasoning is unconvincing. Henderson's previous experience with court proceedings, about which so much has been made, was hardly instructive. The entire evidence on this point came from Henderson and was as follows:

"Q. What did you do which caused your arrest? A. Well, I was on my way out to Ford's one morning walking out West Fort Street, and about four o'clock the police picked me up and said, told me stick them up, and I asked what was the matter and they said, 'You are the one, all right,' and I said, 'One what?' They said I had held up a woman and took some money. I didn't have no money on me at that time because when I left my uncle's house I didn't have a red cent on me, so carried me back to the Forest Street Station. That is the first time I was ever in jail in my life. I didn't know just what to do at the time. They carried me back and took me out and talked to me and carried me back again and called me out and talked to me and talked to me again and they carried me in a little room and I got afraid and pleaded guilty and they carried me to Central Station about nine that morning and I changed my plea from guilty to not guilty and they sent me State's lawyer and he listened to the case and told me to plead guilty and I would get off easy and I did plead guilty and sentenced me from one to ten."

His one other brush with the law was even less edifying:

"Q. Have you ever had any difficulty of a sexual nature with any other person? A. Well, one time I went to a disorderly house, so next day I didn't know the girl was under age and her mother tried to have me arrested. I was over at Berea. I went over to Cleveland where they wanted me at police headquarters and she told them to turn me loose; was no charge against me because this girl was in a disorderly house."

## V.

If then, as I think, the record conclusively shows that for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in Henderson's confinement, the question that remains is whether or not he waived the right to the assistance of counsel.

The Michigan courts apparently found that there was such a waiver. But in Michigan the rule seems to be that a plea of guilty without benefit of counsel itself amounts to a waiver of the right to counsel. In re Elliott, 1947, 315 Mich. 662, 668–669, 24 N.W.2d 528; People v. De Meerleer, 1946, 313 Mich. 548, 21 N.W.2d 849, reversed 1947, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584. As aptly stated in the appellant's brief, the application of that rule in the present case would end consideration of the Constitutional issue at the very point where it should begin. See People v. Henderson, 343 Mich. 465, 72 N.W.2d 177.

In any event, such a rule has no place in the standard of the Federal Constitution. A plea of guilty without benefit of counsel is not of itself a waiver of the right to counsel under the Fourteenth Amendment. Rice v. Olson, 1945, 324 U.S. 786, 788, 65 S.Ct. 989, 89 L.Ed. 1367; Smith v. O'Grady, 1941, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859; Williams v. Kaiser, 1945, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398; Tompkins v. State of Missouri, 1945, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407; De Meerleer v. People of State of Michigan, 1947, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584; Foster v. People of State of Illinois, 332 U.S. 134, 137, 67 S.Ct. 1716, 91 L.Ed. 1955; Uveges v. Commonwealth of Pennsylvania, 1948, 335 U.S. 437, 441, 69 S.Ct. 184, 93 L.Ed. 127; Commonwealth of Pennsylvania ex rel. Herman v.

390

Claudy, 1956, 350 U.S. 116, 122, 76 S.Ct. 223, 100 L.Ed. 126.

The only suggestion in the record that Henderson waived his right to counsel appears in the testimony of one of the police officers given in 1953 at the hearing upon Henderson's second motion for a new trial:

"Q. Did you or anyone in your presence question him at the time he was put in the cell? A. I didn't question him myself. The Chief at that time asked him—

"Q. Who was that? A. Asked him if he had an attorney or wanted an attorney.

"Q. What did he say? A. Said no, he would like to get it over with as soon as possible.

"Q. Who was the chief? A. Arthur Rosso."

Arthur Rosso was dead at the time of the hearing.

On the other hand, Henderson testified at the same hearing that when arraigned before the justice of the peace in the jail he asked for a lawyer, and that his request was refused:

"Q. Did you say anything to Mr. Jeannette? A. I asked him why they wouldn't let me call my brother and why wasn't it possible to have an attorney. He told me there was nothing he could do; his hands were tied."

4. Henderson had two brothers living in Mount Clemens. He was acquainted with the justice of the peace, Mr. Jeannette, because his cousin had worked for Mr.

This testimony was uncontradicted.[4]

In view of the judge's failure to advise Henderson of his right to counsel at the night proceeding of the court—his failure to make any inquiry whatsoever upon the subject—and in view of Henderson's uncontradicted testimony that his request for counsel had been denied, I think the burden of showing that he did not waive his right to counsel has been sustained.

The uncorroborated statement of the police officer as to what the chief asked Henderson in his jail cell was insufficient in my opinion to support a conclusion that Henderson was either apprised of or intelligently waived a Constitutional right which the circumstances of this case made such a vital one. "Where the right to counsel is of such critical importance as to be an element of Due Process under the Fourteenth Amendment, a finding of waiver is not lightly to be made." Moore v. State of Michigan, 355 U.S. 155, 161, 78 S.Ct. 191, 195, 2 L.Ed.2d 167.

\*     \*     \*     \*     \*     \*

The prompt and vigorous administration of the criminal law is to be commended and encouraged. But swift justice demands more than just swiftness. Fully mindful that the extraordinary writ of habeas corpus is to be vigorously guarded and sparingly used, I would set aside the district court's order of dismissal with directions to issue the writ.

Jeannette's mother. Jeannette's was the one familiar face that Henderson saw during the whole night.