## MOORE *v.* MICHIGAN.

No. 42. Argued October 15–16, 1957.—Decided December 9, 1957.

*William H. Culver,* acting under appointment by the Court, 352 U. S. 958, argued the cause and filed a brief for petitioner.

*Samuel J. Torina,* Solicitor General of Michigan, argued the cause for respondent. With him on the brief were *Thomas M. Kavanagh,* Attorney General, *Jacob A. Dalm, Jr.* and *J. Douglas Cook.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

On October 29, 1938, the Circuit Court of Kalamazoo County, Michigan, accepted the petitioner's plea of guilty to an information charging him with the murder of an elderly white lady. He was sentenced to solitary confinement at hard labor for life in Michigan's Jackson Prison, where he has since been confined.[1] Petitioner, a Negro with a seventh-grade education, was 17 years old at the time. On May 26, 1950, he filed a delayed motion for a new trial in the Circuit Court. He asserted constitutional invalidity in his conviction and sentence because he did not have the assistance of counsel at the time of his plea and sentence. The Circuit Court, after hearing, denied the motion, and the Supreme Court of

---

[1] Michigan long ago abolished capital punishment. The sentence is the maximum sentence for murder. Mich. Stat. Ann., Henderson 1938, § 28.548. See *Quicksall* v. *Michigan,* 339 U. S. 660, 664.

Michigan affirmed.[2]   We granted certiorari to decide the important question raised involving a plea of guilty to a charge of murder where the accused was without the benefit of counsel.[3]

The petitioner was arrested during the afternoon of October 26, 1938, a few hours after the murder was committed.   He was confined in a Kalamazoo jail and was questioned by local law authorities from time to time until the afternoon of October 28, when he orally confessed to the crime.[4]   On Saturday morning, October 29, 1938, he was arraigned in the Circuit Court where he pleaded guilty, was adjudged guilty of murder in the first degree, and, after sentence, was transferred from the Kalamazoo jail to the Jackson Prison.

In accordance with the then prevailing procedure no stenographic transcript was taken of the proceedings in the Circuit Court at the time of the arraignment and plea.   However, at the hearing held on the delayed motion for a new trial, two witnesses, who were present in the courtroom on October 29, 1938, testified as to what then transpired.   On the basis of their testimony the Circuit Court in denying the motion for new trial found as a fact—which finding is, of course, accepted by us—that before the petitioner tendered the plea of guilty the trial judge asked the petitioner "whether he had a lawyer and

---

[2] *People* v. *Moore*, 344 Mich. 137, 73 N. W. 2d 274.   The majority opinion relied upon *Quicksall* v. *Michigan*, 339 U. S. 660; the dissenting opinion upon *De Meerleer* v. *Michigan*, 329 U. S. 663.

[3] 352 U. S. 907.

[4] Defendant was questioned on the night of his arrest until approximately 2 or 3 o'clock in the morning of the following day.   On October 27, 1938, he was questioned from approximately 8 a. m. until 10 or 11 p. m.   On October 28, 1938, he was questioned from approximately 8 a. m. until noon and again in the afternoon when he orally confessed.   He was then taken before a municipal court justice where he waived examination and was bound over to Circuit Court for trial.

whether he desired to have a lawyer, and that [the petitioner] gave a negative reply to both of these inquiries, and stated that he wanted to get the matter over with."

The record further discloses that at the arraignment the trial judge, acting in conformity with Michigan procedure, which required him to conduct an investigation into the voluntariness of any plea of guilty,[5] conferred privately with petitioner for "some five to ten minutes" in chambers. Upon the return of the judge and petitioner to the courtroom, the judge stated that the plea would be accepted and proceeded to conduct the hearing required by Michigan law[6] to determine the degree of the offense of murder. At this hearing several witnesses testified to the details of the crime. The petitioner took no part in the examination of these witnesses nor did he testify. At the conclusion of the testimony, the trial judge pronounced judgment that the petitioner was guilty of murder in the first degree, and imposed sentence.

The judge made a statement, stenographically transcribed, that, over the previous three years, the petitioner had "been in trouble four or five times, consisting of breaking and entering and unlawful taking of automobiles" and had been handled as a juvenile offender on such occasions. He also stated that the petitioner had "discussed the whole affair [the murder] very freely with me in all its revolting details" and that "in my private interview with respondent, I assured him that he must not plead guilty unless he really is guilty; that he was not required to plead guilty; that he could have a trial by jury if he desired it. He assured me freely and voluntarily that he is guilty and that his one desire is to have it all over, to get to the institution to which he is to be

---

[5] Mich. Stat. Ann., 1954, § 28.1058. For present practice see Mich. Acts 1957, No. 256; Mich. Court Rule 35–A, adopted June 4, 1947, effective September 1, 1947.

[6] Mich. Stat. Ann., 1954, § 28.550.

committed, and to be under observation and to be examined. . . ." The judge at this point recited the details of the crime as told to him by the petitioner and then stated: "Such is his story to me in private, told very calmly; without any compulsion whatever. He insists that there is something wrong with his head; that he has had something akin to queer sensations before this."

We may reasonably infer from the record that neither the trial judge nor the Michigan courts which considered the delayed motion thought that the petitioner's plight required the assistance of counsel to satisfy the requisites of the fair hearing secured by the Due Process Clause of the Fourteenth Amendment in a state prosecution. The principles determining the extent to which this constitutional right to counsel is secured in a state prosecution have been discussed in a long series of decisions of this Court.[7] We hold that the petitioner's case falls within that class in which the intervention of counsel, unless intelligently waived by the accused, is an essential element of a fair hearing.

The petitioner was 17 years of age and had a seventh-grade education. Cf. *De Meerleer* v. *Michigan,* 329 U. S. 663; *Wade* v. *Mayo,* 334 U. S. 672; *Williams* v. *Huff,* 79 U. S. App. D. C. 326, 146 F. 2d 867. He was charged with

---

[7] *Powell* v. *Alabama,* 287 U. S. 45; *Smith* v. *O'Grady,* 312 U. S. 329; *Betts* v. *Brady,* 316 U. S. 455; *Williams* v. *Kaiser,* 323 U. S. 471; *Tomkins* v. *Missouri,* 323 U. S. 485; *House* v. *Mayo,* 324 U. S. 42; *Rice* v. *Olson,* 324 U. S. 786; *Hawk* v. *Olson,* 326 U. S. 271; *Canizio* v. *New York,* 327 U. S. 82; *Carter* v. *Illinois,* 329 U. S. 173; *De Meerleer* v. *Michigan,* 329 U. S. 663; *Foster* v. *Illinois,* 332 U. S. 134; *Gayes* v. *New York,* 332 U. S. 145; *Marino* v. *Ragen,* 332 U. S. 561; *Bute* v. *Illinois,* 333 U. S. 640; *Wade* v. *Mayo,* 334 U. S. 672; *Gryger* v. *Burke,* 334 U. S. 728; *Townsend* v. *Burke,* 334 U. S. 736; *Uveges* v. *Pennsylvania,* 335 U. S. 437; *Gibbs* v. *Burke,* 337 U. S. 773; *Quicksall* v. *Michigan,* 339 U. S. 660; *Palmer* v. *Ashe,* 342 U. S. 134; *Chandler* v. *Fretag,* 348 U. S. 3; *Massey* v. *Moore,* 348 U. S. 105; *Pennsylvania ex rel. Herman* v. *Claudy,* 350 U. S. 116.

a crime carrying Michigan's maximum penalty, *viz.*, solitary confinement at hard labor for life without possibility of parole. Mich. Stat. Ann., 1954, §§ 28.548, 28.2304. Cf. *Powell* v. *Alabama,* 287 U. S. 45. The record shows possible defenses which might reasonably have been asserted at trial, but the extent of their availability raised questions of considerable technical difficulty obviously beyond his capacity to comprehend. For instance, one possible defense was insanity, suggested by the trial judge's statements that "his one desire is to have it all over, to get to the institution to which he is to be committed, and to be under observation and to be examined . . ."; "he insists that there is something wrong with his head; that he has had something akin to queer sensations before this." Another possible defense was mistaken identity, suggested by the fact that the evidence pointing to him as the perpetrator of the crime was entirely circumstantial. Cf. *Pennsylvania ex rel. Herman* v. *Claudy,* 350 U. S. 116; *Rice* v. *Olson,* 324 U. S. 786. Moreover, the proceedings to determine the degree of murder, the outcome of which determined the extent of punishment, introduced their own complexities. With the aid of counsel, the petitioner, who, as we have said, neither testified himself in the proceeding nor cross-examined the prosecution's witnesses, might have done much to establish a lesser degree of the substantive crime, or to establish facts and make arguments which would have mitigated the sentence. The right to counsel is not a right confined to representation during the trial on the merits. *Reece* v. *Georgia,* 350 U. S. 85. The circumstances compel the conclusion that the petitioner's rights could not have been fairly protected without the assistance of counsel to help him with his defense.

However, we may also infer from the record that the Michigan courts held that even if petitioner was constitutionally entitled to the assistance of counsel he waived

this right when he told the trial judge that "he didn't want one, didn't have one, he wanted to get it over with." The constitutional right, of course, does not justify forcing counsel upon an accused who wants none. See *Carter* v. *Illinois,* 329 U. S. 173, 174. But, "where a person convicted in a state court has not intelligently and understandingly waived the benefit of counsel and where the circumstances show that his rights could not have been fairly protected without counsel, the Due Process Clause invalidates his conviction . . . ." *Pennsylvania ex rel. Herman* v. *Claudy,* 350 U. S. 116, 118. Where the right to counsel is of such critical importance as to be an element of Due Process under the Fourteenth Amendment, a finding of waiver is not lightly to be made. Cf. *Johnson* v. *Zerbst,* 304 U. S. 458, 464; *Glasser* v. *United States,* 315 U. S. 60, 70; *Von Moltke* v. *Gillies,* 332 U. S. 708, 723.

This Court held in *Johnson* v. *Zerbst, supra,* that when a judgment of conviction entered in a federal court is collaterally attacked upon the ground that the defendant did not have the benefit of counsel, he has the burden of showing, by a preponderance of the evidence, that he did not have counsel and did not competently and intelligently waive his constitutional right to the assistance of counsel. We have found that the petitioner was entitled to the benefit of counsel to secure the fair hearing guaranteed to him by the Due Process Clause of the Fourteenth Amendment. Whatever may be the differences in the substantive right to counsel in federal and state cases, when the defendant in a state case has established his constitutional right to the benefit of counsel, he should carry the same burden of proving nonwaiver as is required of a defendant in a federal case. We therefore hold that the rule of *Johnson* v. *Zerbst* applies in this case and that the petitioner had the burden of showing, by a

preponderance of the evidence, that he did not intelligently and understandingly waive his right to counsel.

Notwithstanding the petitioner's express disavowal, before his plea, of a desire for counsel, the petitioner developed evidence at the hearing on the delayed motion which sustained his burden of showing that the disavowal was not intelligently and understandingly made and hence was not a waiver. *Williams* v. *Huff*, 79 U. S. App. D. C. 326, 146 F. 2d 867. This crucial evidence, apparently not known to the trial judge, was brought out on the cross-examination of the Sheriff of Kalamazoo County at the hearing on the delayed motion, and concerned conversations between the Sheriff and the petitioner before the petitioner orally confessed on the afternoon of October 28, 1938:

"Q. You didn't advise him it would probably be best to plead guilty?

"A. Well, the only way I could answer that right is just to give you a little of the conversation there, perhaps, if you wish me to.

"Q. Relate that, that will probably be helpful.

"A. In talking with Willie Moore—that was before he had made any statement—I told him that if he was guilty of it he might better own up on it because I says there could be trouble. Tension is very high outside and there could be trouble. If you are not guilty of it, why then, I says, I would stand pat forever after. Then I told—I spoke to him about what would be required of him and I would have to take him to the Municipal Court for his arraignment in the lower court and then back over there, and I told him he would be entitled to a hearing in lower court and I says, 'There you will have the Judge read to you and you can waive or demand an examination. You are entitled to an examination over there. It is

my duty, and it is up to me, to protect you, to use every effort at my command to protect you,' but, I says, *'the tension is high out there and I am just telling you what could happen if it was started by someone.'* I don't know the language I used.

.    .    .    .    .

"Q. Did you also tell him if he plead guilty he would be sent to Jackson immediately? Do you remember saying anything like that?

"A. I don't know as I come out and said at any time for him to plead one way or the other, *but what I was putting over to him was the fact that if you are guilty and will be sent away you might better be getting away before trouble* because I had had information there was certain colored fellows, a group of them, that was going to interfere with me, and also that there was a bunch of Holland fellows going to meet me when I go to Jackson, they would meet me there at Galesburg there, and, therefore, when he was sentenced I avoided the main route and went way through by Gull Lake and across over in the hills there." (Emphasis supplied.)

Although the trial judge rejected the petitioner's testimony as not worthy of belief, in this instance the Sheriff corroborated the petitioner's testimony, given before the Sheriff took the stand, that the Sheriff had told him "that if I didn't plead guilty to this crime, they couldn't protect me, under those conditions, they says, during the riot, that they didn't know what people they would do, and that they couldn't protect me." Petitioner further testified that he pleaded guilty because of that statement of the Sheriff: "After the man tell me he couldn't protect me then there wasn't nothing I could do. I was mostly scared than anything else."

The Circuit Court found the Sheriff's testimony insignificant because other evidence showed that there was in fact "no threat of mob violence, no congregation of anything that could by any stretch of reasoning be considered a mob or a riotous gathering, and that while the Sheriff felt inclined to take certain precautions and did take certain precautions to avoid any trouble, there was nothing in the situation then existing to indicate that the Respondent had been coerced into a false plea, or that he had been placed in fear of insisting upon his constitutional rights." But plainly it is of no moment to the inquiry that the situation described to the petitioner by the Sheriff did not exist. The petitioner saw only law officers while being held continuously in close confinement from a time just hours after the murder until he orally confessed, and was hardly in a position to know or test the accuracy of what the Sheriff told him. The Sheriff's statement must be evaluated for its effect upon the capacity of this 17-year-old Negro youth of limited education and mental capacity to make an intelligent, understanding waiver of constitutional rights of supreme importance to him in his situation.

We believe that the expectation of mob violence, planted by the Sheriff in the mind of this then 17-year-old Negro youth, raises an inference of fact that his refusal of counsel was motivated to a significant extent by the desire to be removed from the Kalamazoo jail at the earliest possible moment. The trial judge's report of his interview with the petitioner is consistent with this inference in that the report states that the petitioner told the judge that "his one desire is to have it all over, to get to the institution to which he is to be committed, and to be under observation and to be examined." A rejection of federal constitutional rights motivated by fear cannot, in the circumstances of this case, constitute an intelligent waiver. This conclusion against an intelligent waiver is

fortified by the inferences which may be drawn from the age of petitioner, *Williams* v. *Huff,* 79 U. S. App. D. C. 326, 146 F. 2d 867, and the evidence of emotional disturbance, *Hallowell* v. *United States,* 197 F. 2d 926.

We thus conclude that the petitioner had sustained his ultimate burden of proving that his plea of guilty was invalidly accepted as obtained without the benefit of counsel and that he did not waive his right to counsel.

The judgment is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BURTON, with whom MR. JUSTICE FRANK-FURTER, MR. JUSTICE CLARK and MR. JUSTICE HARLAN concur, dissenting.

The Court's decision rests upon its view that, despite the contrary conclusions of the Circuit and Supreme Courts of Michigan, petitioner has shown that he was in fact so alarmed that he was not able freely, intelligently and understandingly to plead guilty and to waive his right to counsel. But for that issue, this case should be summarily affirmed on the authority of *Quicksall* v. *Michigan,* 339 U. S. 660, which dealt with a comparable situation that arose before the same trial judge under like procedure.

The only contemporaneous evidence as to petitioner's attitude and equanimity at the time of his trial, in 1938, is the statement which Circuit Judge Weimer made while presiding at the trial. He made it following his private interview with petitioner, and immediately preceding his acceptance of petitioner's plea of guilty. He portrayed petitioner as having, in that interview, "very calmly; without any compulsion whatever" "freely and voluntarily" discussed his crime, his guilt and "his one desire . . . to have it all over . . . ." When making

this statement the judge's attention was focused directly upon his responsibility to determine the capacity of petitioner to plead guilty and to waive his constitutional privileges. The statement accordingly commands respect and is entitled to great weight.

By 1950, Judge Weimer had died and the prosecuting attorney, who had conducted the trial for the State, had suffered a stroke rendering him incapable of testifying. However, two witnesses did testify, in 1950, as to their recollection of petitioner's demeanor in 1938.

One was the chief deputy sheriff, who, in 1938, as a deputy sheriff, had been in charge of taking petitioner to and from the courtroom and to the lobby when petitioner was leaving for the penitentiary. His testimony included the following:

> "Q. What did you notice, if anything, about his appearance that would have anything to do with the question whether or not he appeared to be in fear or relaxed or what?
>
> "A. He was very relaxed. There was no sign of fear and no showing, either physically or by speech.
>
> "Q. Anything that would lead you to that conclusion?
>
> "A. To not being in fear?
>
> "Q. Yes.
>
> "A. He was nonchalant. . . ."

The other witness was a Circuit Judge, who, in 1938, had participated, as an assistant prosecutor, in the interrogation of petitioner when the latter confessed his crime. This witness testified:

> ". . . I, of course, felt that his answers were fair—were honest and candid in his final statement that he made. That is just my opinion, but he answered the questions that were put to him. To me he seemed very calm and not excited in the least. He

spoke about it quite in a matter of fact way. His whole attitude was such that it was hard for me to understand his lack of emotion in telling the story of just what happened or what he claimed happened, what he did and what she did."

As against this, petitioner offered his own statement, quoted by the Court, *ante,* p. 163. Judge Sweet, who presided in 1950, gave little credence to it and said in his opinion:

"While this Court has not disregarded the testimony of the [petitioner], but on the contrary has carefully considered it, it is the conclusion of this Court that the [petitioner's] testimony is not worthy of belief. This conclusion is arrived at because of the manner of the witness while testifying, his interest in the outcome of these proceedings, and the many points of conflict between his testimony and the testimony of the two witnesses herein referred to."*

---

*The following are examples of the conflicts presented by petitioner's testimony:

He testified that a large number of people hammered at his cell door, whereas the sheriff and deputy sheriffs denied this and said that it was physically impossible for a group of people to reach petitioner's cell and that his cell door was not of a type conducive to hammering.

Petitioner said that the judge, in arraigning him, did not inform him of his right to counsel. Several witnesses testified to the contrary and Judge Sweet, presiding at the hearing on the delayed motion, said:

"It is the further conclusion of this Court that before such plea was accepted by the late Judge Weimer, the [petitioner] was informed of his right to a trial by jury and of his right to be represented by counsel, and that the [petitioner] indicated his desire to proceed without counsel and without a trial, and his desire to have his plea of guilty received by the Court and sentence imposed without further delay."

Petitioner, in testifying as to what took place at his private interview with Judge Weimer, said repeatedly and unequivocally that the

This leaves for consideration the sheriff's statement, quoted by the Court, *ante,* pp. 162–163. His recollection was that he told petitioner that, as sheriff, it was his duty to protect petitioner and that he would use every effort at his command to do so, but that he added " 'the tension is high out there and I am just telling you what could happen if it was started by someone.' I don't know the language I used." He did not testify as to petitioner's mental or emotional condition. Furthermore, his recollection as to what he had said about tension must be read in comparison with the abundant testimony of others supporting Judge Sweet's conclusion that, in 1938, there had been little community tension and "no threat of mob violence . . . ." That the judge discounted the effect of the sheriff's testimony appears from his denial of petitioner's motion on the express ground that he believed that petitioner's plea of guilty "was freely and voluntarily made . . . ."

The issue is one of fact as to what occurred 19 years ago. Three times the state courts have concluded that petitioner acted freely, intelligently and understandingly. On this record, I would affirm that judgment.

---

sheriff came with petitioner into the judge's chambers and not only was present, but did much of the talking and leading of petitioner's examination. The sheriff and others, however, testified that it was the sheriff's practice not to attend such private sessions of the judge, and that the sheriff was not present on this occasion which Judge Weimer described as his "private interview" with petitioner.