[Crim. No. 3618. First Dist., Div. One. Oct. 29, 1959.]

THE PEOPLE, Respondent, v. HORACE LEE WILSON, Appellant.

Don Campbell, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—Convicted of violating section 503 of the Vehicle Code (taking or driving an automobile without consent of the owner), defendant-appellant's principal contention is that he was wrongfully thwarted in his search for a

person he claims was a material witness. He asserts that his rights under the state and federal Constitutions were thereby violated. Consequently, he says, he did not have a fair trial.

There is evidence that the car was stolen from a used car lot in Richmond some time prior to May 5, 1958, and was found in defendant's possession in Stockton on May 6, 1958. The operator of a parking lot in Stockton testified that he saw this car in the possession of the defendant on May 5. He said also that he had seen a man working in a nearby Stockton restaurant called Mary's Place whom he thought was the defendant. "I think I saw him once in the kitchen when I went over there to order a hamburger."

Defendant testified that he had not been in Richmond since April 22, 1958; he did not drive the car, nor was he in the car, at any time before May 6, 1958; that the car was entrusted to him by a person who had worked as a cook in the restaurant called Mary's Place, a man about 5 feet and 2 or 3 inches tall, and known to defendant as Shorty or Curley. Defendant had bought some gas for the car and was returning to pick Shorty up and drive out to work at a certain ranch when he was apprehended by the police. He recently heard that Shorty sometimes went by the name of Ivory Phillips, sometimes as Ivory Adams and was now an inmate of the San Joaquin County jail, committed thereto under a still different name.

One of the owners and managers of a Stockton hotel situate near Mary's Place restaurant testified that a person called Ivory Phillips resided at her hotel from the 8th of April to about the last of April, 1958, and while a resident there worked at Mary's Place. She said he continued to work there for about a week after moving out of her hotel. She described Phillips as "a short fellow . . . around about five three or four [and] kind of a brown skinned fellow." She had also heard him called Ivory Adams. He was reputed to have used various names and, according to information she had received, was now in the San Joaquin County jail.

Defendant called to the witness stand Ray Stoffels, Chief of the Criminal Division of the Sheriff's Office, Contra Costa County, qualified him as a fingerprint identification expert, and asked him: ". . . if a person has a file with a full print—set of fingerprints on an individual, and if there is a group of people, each one of whom there is a full set of fingerprints on, can you, without regard to the names that the people may have on their file, match up the first file with the full set of

fingerprints with any set of fingerprints from such a group that would match it?"

The prosecution objected that this was an irrelevant question. Defense counsel stated he was "prepared to show that the Stockton Police Department have a file on Ivory Phillips with a full set of fingerprints" and "that every prisoner in the San Joaquin——," whereupon the jury was excused and the discussion continued outside the presence of the jury.

Defense counsel explained that he had issued a subpoena for Mr. Phillips, "this cook," but was unable to obtain service "because the man is in prison under an alias" and "in order to establish the identity of the prisoner that I desire to have subpoenaed, it is necessary to match the fingerprints which are in the Stockton Police file under Ivory Phillips, to check those fingerprints against the fingerprints of the prisoner's in the San Joaquin County Jail." Defense counsel added: ". . . I'm trying to effect service of a subpoena on Ivory Phillips, and he's in prison under an alias in the San Joaquin County Jail. And the only way I can identify him in order to effect service of the subpoena, is to have these fingerprints matched. And I need an order from this Court directing that that be done in order to procure the attendance of this witness who is essential to the defense of my case."

The prosecutor said he had phoned the sheriff's office at Stockton and learned they had a record of an Ivory Phillips in 1954, 1955 or 1956, on a common drunk charge. He did not know whether it is the custom there to take a full set of prints on a common drunk charge. The prosecutor had called the Stockton city jail trying to locate Ivory Phillips, also the Richmond police department, without avail. Nor did the Stockton sheriff's office have any record of an Ivory Phillips presently incarcerated.

Asked to make his request more specific, defense counsel said "I want an order that the Stockton County Sheriff's Office shall compare the fingerprints in their file on Ivory Phillips with the fingerprints of the present inmate of the County Jail," and that "if they then establish that one of the inmates in the County Jail is the person Ivory Phillips, that I then may subpoena him."

Counsel added: ". . . unless I get this—I have no means of getting this accomplished without the Court's order. And unless I do that, I have no way of procuring this essential witness. I might also say that there is, in Sacramento, this

bureau that has all this information, but they won't give it to me because I'm just a private lawyer. But it's available to any law enforcement agency.''

The prosecutor stated that he recalled no evidence in this case that the Stockton officers fingerprint "common drunks" and expressed the view that "fingerprinting common drunks is ridiculous.''

The court, addressing defense counsel, ruled: ''. . . if you have the name of any person in the County Jail in custody, I shall make an order that they come here. I think that's within the province of the Court. But I want you to name the party. . . . He may be John Doe alias Ivory, whatever the name is.'' Defense counsel again explained his need to have the fingerprints checked, not knowing the alias last used by Phillips. The court said: ''. . . don't go about it this round-about way of whole sets of records of fingerprints and all that. . . . I don't think we would be warranted in going that far. I would do this: make an order that Ivory Adams or Ivory Phillips—— . . . I'll make an order that he appear here.''

After some further discussion, the prosecutor volunteered to phone the Stockton officers and ask ''if they have this person.'' This he did, defense counsel accompanying him, and then reported: ''. . . we called up the San Joaquin County Jail. There is no man named Ivory Phillips, no man named Ivory Adams, no colored man named Adams, no colored man named Ivory, incarcerated therein. MR. BIRD [defense counsel]: So the only thing that would serve my purpose would be the check of the fingerprints, and I take it Your Honor has ruled adversely on that. THE COURT: I don't think that we can put them to work on such—what shall I say, a nebulous course?—— . . . as that. Yes. I'm sorry. I would have been glad to issue an order if we could identify the person you want. Yes. So I don't know that you need to go further with the testimony of Mr. Stoffels, do you? MR. BIRD: No.''

The discussion between court and counsel on this subject demonstrates (contrary to one of the State's contentions upon this appeal) that the denial of defendant's request was predicated upon the assumed legal impropriety of making any such inquiry concerning fingerprints, not upon a determination by the judge that defendant's statements about having received the car from one Ivory Phillips and that Phillips is an inmate of the San Joaquin County jail under an alias to the defendant unknown, were pure fabrications.

It seems to us it was a reasonable request under the circumstances of this case. Defendant had been in custody continuously since May 6, 1958. It was now September 25, 1958. He was not free to go to Stockton and view the prisoners there, assuming he might be granted the privilege of viewing them if at liberty and thus free to make such a search. He did not have an attorney until July 9, 1958. His attorney had never seen Phillips and therefore could not locate him under an unknown name. Neither defendant nor his attorney had access to fingerprint records kept by law enforcement officials.

Identification by fingerprints would seem equally as sure and certain as by name; more so, in this case, upon the evidence that Phillips was in jail under a new or different alias. True, that was hearsay evidence but it went into the record without objection. Indeed, the prosecutor interposed an objection and then withdrew it, saying that the witness could testify ''where Ivory was through hearsay.''

It would have been a very simple matter for the district attorney or his deputy, when phoning to Stockton officials that day, to have asked if they have a fingerprint record of Ivory Phillips. (The deputy had previously ascertained that the sheriff's office at Stockton had a record of an Ivory Phillips in 1954, 1955, or 1956.) If the answer had been ''No,'' it would have ended that particular inquiry; if ''Yes,'' the sheriff could then have been asked to check against the fingerprints in his file concerning prisoners currently in his custody. Proof whether or not it would be practicable and feasible for the sheriff to conduct such a search, and reasonable upon the part of the district attorney to request or the trial court to direct him to conduct it, was the very purpose of the question which defense counsel asked of fingerprint identification expert Stoffels but which Stoffels upon the prosecutor's objection was not allowed to answer.

Such a question seems entirely reasonable and potentially fruitful of results. The fingerprint method of identification has come into vogue over the years. Anyone can change his name at will, but not his fingerprints. Also, fingerprints reputedly, are readily classifiable. The Legislature sets great store by them as a ready means of identification. It requires each sheriff and each police chief to furnish the State Bureau of Criminal Identification and Investigation ''daily copies of fingerprints'' (Pen. Code, § 11112), imposes upon the

attorney general the duty of keeping a "complete record of all copies of fingerprints" (Pen. Code, § 11106) and of making a "complete and systematic record and index, providing a method of convenience, consultation and comparison" (§ 11104). It is the further duty of the attorney general to furnish to all peace officers, upon application, "all information pertaining to the identification of any person," upon certification by the requesting officer that the information applied for is "necessary in the interest of the due administration of the laws, and not for the purpose of assisting a private citizen in carrying on his personal interest or in maliciously or uselessly harassing, degrading or humiliating any person" (§ 11105).

It would seem quite proper for the state to utilize some of this information in furtherance of defendant's right "to have the process of the court to compel the attendance of witnesses in his behalf" and his right not to be deprived "of life liberty, or property without due process of law" (State Const., art. I, § 13; and U. S. Const., art. XIV of Amendments).

 It does not appear that the Sixth Amendment of the Constitution of the United States applies directly to the states but the due process clause of the Fourteenth Amendment accomplishes substantially the same results in certain situations: "The 'due process of law' which the Fourteenth Amendment exacts from the States is a conception of fundamental justice. . . . It is not satisfied by merely formal procedural correctness, nor is it confined by any absolute rule such as that which the Sixth Amendment contains in securing to an accused 'the Assistance of Counsel for his defense.' " (*Foster* v. *People of State of Illinois*, 332 U.S. 134, 136 [67 S.Ct. 1716, 91 L.Ed. 1955]. See also *Palko* v. *Connecticut*, 302 U.S. 319, 324-325 [58 S.Ct. 149, 82 L.Ed. 288] ; *Betts* v. *Brady*, 316 U.S. 455, 461-462 [62 S.Ct. 1252, 86 L.Ed. 1595] ; *Williams* v. *Kaiser*, 323 U.S. 471, 473-477 [65 S.Ct. 363, 89 L.Ed. 398] ; *Moore* v. *Michigan*, 355 U.S. 155, 159-160 [78 S.Ct. 191, 2 L.Ed.2d 167].)

 We conclude that defendant's fundamental rights were violated and that the judgment must be reversed. This ruling is, of course, limited to the circumstances of this case. We do not undertake to lay down a formula. We doubt if it is feasible to do so. Each case must be considered upon the basis of its own facts and circumstances.

In view of our conclusion we need not consider other questions discussed by the parties.

The judgment and order appealed from are reversed.

Bray, P. J., and Tobriner, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 23, 1959.