**Burton Junior POST, Petitioner,**

v.

**Otto C. BOLES, Warden of the West Virginia State Penitentiary, Respondent.**

**Civ. A. No. 1196-W.**

United States District Court
N. D. West Virginia,
at Wheeling.

July 5, 1963.

Jeremy C. McCamic, Arthur M. Recht, Thomas B. Miller, Wheeling, W. Va., for petitioner.

Claude A. Joyce, Asst. Atty. Gen., for respondent.

CHARLES F. PAUL, District Judge.

On May 29, 1956, Burton Junior Post, the petitioner in this habeas corpus proceeding, entered separate pleas of guilty to a total of twelve serious felony indictments in the Circuit Court of Roane County, West Virginia. Three of those indictments charged crimes of armed robbery; two charged kidnapping; five more charged breaking and entering or entering without breaking; and the remaining two charged forgery. Following his pleas, Post was sentenced to consecutive twenty-five year prison terms on each of the indictments charging armed robbery and kidnapping—one hundred and twenty-five years in all. Sentences for the other crimes were to be served concurrently. That Post was not represented by counsel at the time his pleas were entered is undisputed. Post's principal allegation, here and elsewhere, is that he was not advised of his right to be represented by counsel, and that even if he was so advised, he made no intelligent and understanding waiver of that right. These allegations prompted the court to grant Post's application for a writ of habeas corpus and hold a hearing to inquire into the legality of his detention.[1]

1. Post applied to the West Virginia Supreme Court of Appeals for a writ of habeas corpus on May 20, 1961. The application was summarily denied. Post then sought review in the United States Supreme Court by writ of certiorari. The

The record, as developed through the pleadings, the exhibits (including the record in the West Virginia Supreme Court of Appeals), and the hearing, reveals the following factual situation:

Post, who was twenty-five years old in 1956, spent most of his adolescent and post-adolescent years in State institutions. At the age of fourteen he was a severe disciplinary problem, and his foster-father, Russell Starcher, swore out a complaint which resulted in Post's commitment to the West Virginia State Hospital at Weston, as a mental defective. Prior to that time he had accumulated an eighth grade education in Ohio and West Virginia schools.

Post spent a little over three and one-half years at two of the State's mental hospitals. He was variously described and classified as a psychasthenic psychoneurotic, a psychopathic personality, and a schizophrenic "reaction" of the chronic undifferentiated type. Post eloped from the hospitals many times. During the last elopement—in September of 1949—he was arrested in Gilmer County, West Virginia, for breaking into a store. Dr. Zeller, a member of the staff at the Weston Hospital, observed and examined Post while he was being held on the criminal charge, and found him to be without psychosis. Following conviction, Post was returned to Weston for further examination. The staff concluded that he was without psychosis and he was discharged as restored to sanity.

Post's conviction in the Circuit Court of Gilmer County was the result of a plea of guilty. He was represented by counsel through the proceedings. The evidence as to the circumstances surrounding that representation is sparse, but it appears that the lawyer was court-appointed. Post's story, however, is that without any prior communication on the subject, an attorney came to visit him in jail, and Post assumed that the attorney had been retained by his foster-father to handle the case.

In any event, Post was sentenced to a one to ten year term in the State Penitentiary. He served some six years prior to his release on parole in January of 1956. It was about three months later that Post embarked on the criminal spree for which he is now incarcerated.

Supreme Court granted the writ, and citing Uveges v. Pennsylvania, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127, and Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126, vacated the judgment of the West Virginia Supreme Court of Appeals and remanded the case for hearing. See Post v. Boles, 368 U.S. 144, 82 S.Ct. 247, 7 L.Ed.2d 188. The West Virginia Supreme Court of Appeals appointed counsel for Post and proceeded to determine the merit of his contentions on the basis of affidavits and stipulations of facts. The Court concluded, in an opinion by Judge Browning, that Post was advised of his right to counsel; that he competently waived the right; that Post was fully informed of the possible consequences of his guilty pleas; and that Post received a fair hearing in accordance with the requirements of due process of law. See State ex rel. Post v. Boles, W.Va., 124 S.E.2d 697. The United States Supreme Court denied Post's application for a writ of certiorari to review that decision. Post v. Boles, 371 U.S. 833, 83 S.Ct. 57, 9 L.Ed.2d 70.

Post then petitioned this court for his release. This court was originally of the opinion that Post had received a full and fair hearing in regard to his contentions in the West Virginia Supreme Court of Appeals, and, in accordance with the principles of Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, entered an order denying the petition without hearing. A subsequent order was entered, certifying the case for review in the United States Court of Appeals for the Fourth Circuit. Shortly thereafter, the Supreme Court handed down its opinion in the case of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, clarifying the principles of Brown v. Allen and outlining the criteria by which the District Courts are to grant or deny hearings in habeas corpus matters. On the basis of that authority the case was recalled for hearing. Competent counsel was appointed for petitioner.

There is, of course, no contention that Post has not exhausted his available State remedies. Counsel for respondent sought to dismiss the cause on the basis of prior adjudication, but that motion was denied.

The exact chronology of that spree is unimportant, but some discussion of the alleged events is necessary to put the issues in the present case in their proper perspective. After committing a number of (relatively) minor crimes in the latter-middle part of April, Post, in company with a fourteen-year-old girl, Peggy Ann Hosey, held up and robbed, at gunpoint, Miss Hosey's family and another household. With the proceeds, an automobile and a sum of money, Post and Miss Hosey took off on a tour of Ohio, Kentucky and various Southern States. They returned to the Roane County area toward the last of April. Post and Miss Hosey were apprehended on April 30th while Post, holding a hostage at gun-point, was attempting to effect an escape from the scene of a robbery. When Post saw that he was surrounded at a road block, he submitted to arrest.

Shortly after his arrest, Post was taken to a Justice of the Peace. He did not recall whether the magistrate informed him of the nature of the offenses charged. Post did recall, however, reading about his case in the newspapers while he was in jail in Spencer, the county seat. He was permitted to see visitors, and each of his foster parents came in to see him. While in the Spencer jail, also, Post wrote and signed a detailed narrative statement of the events and exploits of the preceding month. The apparent goal of this writing was to absolve the girl, Peggy Ann Hosey, of criminal responsibility.[2] Post testified at the hearing that this written statement was dictated to him by one, Barnes, who was the jailor and also a deputy sheriff. Barnes, on the other hand, stated that Post asked him for a pencil and tablet, and that he, Barnes, was surprised when Post later gave him the statement to forward to the prosecuting authorities, because prior to that time, Post had steadfastly refused to give such a statement to the State Police. After weighing all of the testimony in the light of the circumstances, the court finds incredible Post's testimony to the effect that the detailed confessional statement was not the product of his own efforts and free will. Likewise incredible is Post's story that Barnes advised him that if he would plead guilty, he would "probably" be sentenced to no more than ten years in prison.

Thirteen indictments were seasonably returned against Post by the Roane County grand jury. In addition to the twelve mentioned earlier, Post was charged with the crime of statutory rape. The alleged victim was Peggy Ann Hosey. Statutory rape carries with it in West Virginia the possibility of capital punishment.

Post was brought into the Circuit Court of Roane County early in the morning on May 29, 1956. Post testified that he was immediately brought to the bar of the Court and called upon to plead to the thirteen indictments without being cautioned or advised of his right to court-appointed counsel. The weight of the evidence contradicts this testimony.[3]

George M. Scott, then the Assistant Prosecuting Attorney (and now the Prosecuting Attorney) of Roane County, made

---

2. Miss Hosey was named as a co-defendant in ten of the twelve indictments, above described, charging Post. She was not named in either of the forgery indictments.

3. In accordance with an unfortunate but customary practice in the West Virginia Courts, the proceeding was not reported. The Judge of the Court at the time is now deceased; the former Prosecuting Attorney is incapacitated; and the former Clerk of the Court is retired and living in Mississippi. The pertinent Court orders show only that Post appeared, without counsel. Petitioner's present counsel objected to the State's tendering of evidence designed to show that Post was in fact offered counsel, on the ground that it was improper impeachment of the State Court's record. That objection was overruled as contrary to the holding in Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167, where it was stated that petitioner "had the burden of showing, by a preponderance of the evidence, that he did not intelligently and understandingly waive his right to counsel." 355 U.S. at 161–162, 78 S.Ct. at 195, 2 L.Ed.2d 167. See also Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.

the positive statement that the presiding Judge "followed" his usual practice of advising defendants of their right to counsel. Scott also recalled that Post replied—with no indecision whatsoever—that he did not desire counsel. Scott further testified that the Judge's preliminary remarks to Post included statements to the effect that he was charged with a number of very serious crimes, and that the rape charge carried a possible death sentence.[4] Scott had a vivid recollection of the case for a number of cogent reasons, and, contrary to the usual maxim about lawyers, he left nothing to be desired as a witness. The corroborative testimony of two others present in the courtroom with respect to the habit and custom of the Judge in offering counsel to accused is superfluous. Noteworthy, too, is the corroborating circumstance that Post's co-defendant, Peggy Ann Hosey, who was arraigned after Post was remanded to jail, received the assistance of court-appointed counsel. It is quite clear that the late Judge of the Circuit Court of Roane County made an offer of counsel to Post in unequivocal terms, and that the latter declined the offer in a similar vein.

■ In that state of the record, counsel for Post ask this court to find that Post's declining of counsel was not an intelligent, understanding, and competent waiver. This the court cannot do. We may start with the proposition that even prior to the Supreme Court's decision in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, it was clear that Post had a constitutional right to the assistance of counsel before being called upon to answer these numerous, serious and complex charges. Uveges v. Pennsylvania, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127, and Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126, make that plain. It is true, also, that "Where the right to counsel is of such critical importance as to be an element of Due Process under the Fourteenth Amendment, a finding of waiver is not lightly to be made." Brennan, J., in Moore v. Michigan, 355 U.S. 155 at 161, 78 S.Ct. 191 at 195, 2 L.Ed.2d 167. It has often been stated that the constitutional right to counsel may be waived only if the accused knows of the right and deliberately and intentionally abandons it. See, e. g., United States v. Lavelle, 306 F.2d 216 (2 Cir., 1962).

■ Nevertheless, whether a waiver of counsel is understandingly and competently made is a question of fact to be decided with reference to the particular facts of each case. The record in this case reveals an individual who was ready, willing, and even anxious to face the consequences of a wild fling at lawlessness. Post's representations that he was not aware of his right to counsel do not impress the court. And no significant factor appears in the record from which it can be inferred that Post had any hidden doubt as to whether he should interpose an attorney between himself and a prompt liquidation of his criminal liability. Further, in spite of Post's previous mental condition, the evidence showed that he was acutely sensible of his predicament. He was described by all witnesses as appearing normal and lucid. His tolerably literate confessional statement discloses no hint of abnormality. On the contrary, it shows normal feelings of remorse and a not-unnatural concern for and desire to exculpate Peggy Ann Hosey, with whom Post was emotionally attached. That concern was reiterated in open court when the Judge asked Post if there was anything he wished to say prior to the imposition of sentence.

Counsel for petitioner maintain that since the Supreme Court's opinion in Gideon v. Wainwright, supra, the same rules govern for determining the validity of a waiver of counsel whether the alleged waiver occurs in a federal court or a State court. That may be a correct

**4.** Initially inclined to plead guilty to the rape charge, Post was again warned by the Judge as to the consequences of a guilty plea. He thereupon entered a plea of not guilty to that indictment. The rape indictment was later nolled on motion of the prosecuting authorities.

statement of the law, but the issue is academic in this case. The particular facts tending to show an incompetent waiver of counsel in the federal court case of Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309, are just as foreign to the factual situation in this case as are the facts of the State court case of Moore v. Michigan, supra.

It appears that petitioner intelligently, understandingly, and competently waived his right to counsel. It likewise appears that he was fully cognizant of the seriousness of the charges and of the possible consequences of his pleas of guilty. Release must, therefore, be denied.