**STATE of Missouri, Respondent,**

v.

**Chester SCOTT, Appellant.**

**No. 51839.**

Supreme Court of Missouri,
Division No. 2.

July 11, 1966.

Chester and Odis Johnson were Arkansas woodchoppers, they had been working on Kroner's Island in Arkansas when, according to Chester, Odis "got in trouble with a little old girl down there," and "finally talked me into the notion, told me that if I didn't go I'd always be sorry," of coming to Missouri. They were cutting timber "down below" Rives or Hornersville in October 1949, apparently living together. On October 9 Odis and Chester "had been up at Rives drinking all evening" and "a guy (that) carried him home before I went home." Then Chester "got the same guy" to carry him home where they "kept drinking and messing around" and finally got into an argument. Odis "got to bragging and talking about that girl, and I told him that he could possibly get into trouble over it yet, and so he just started into raving and come at me with a knife and told me that I would never snitch on nobody else." When Odis asked how he could get into trouble over the girl now Chester said, "I had to tell the man I was working for some reason why I was quitting" and "That's what it come up about." But when, as he testified on this hearing, Odis came at him with a knife, Chester "killed him with a double bitted chopping axe," hit him over the head with the flat side of the axe, and then "buried him." Nine days later, October 18, 1949, Chester gave "myself up" and was charged with murder in the first degree.

Thus summarizing these were the dates and course of events; on October 9, 1949, Chester killed and buried Odis Johnson. On October 18, 1949, Chester gave up and on the same date a complaint was filed in magistrate court charging him with murder in the first degree. (The magistrate, incidentally, was the circuit judge who in 1965 heard this 27.26 proceeding, and the then prosecuting attorney was Tom B. Mobley and the circuit judge was the Honorable James V. Billings.) The transcript from magistrate court shows that while Chester's preliminary hearing was set for October 27th, on October 21, 1949,

Norman H. Anderson, Atty. Gen., O. Hampton Stevens, Asst. Atty. Gen., Jefferson City, for respondent.

William B. Morgan, Kennett, for appellant.

BARRETT, Commissioner.

After a hearing in September 1965 upon a motion under Criminal Rule 27.26, V.A. M.R. to vacate and set aside a 1949 judgment and sentence of life imprisonment for murder in the first degree, the court entered an order overruling the motion and the petitioner Chester Scott has appealed.

he "waives preliminary hearing" and was bound over to the Circuit Court of Dunklin County. There is no other record of what transpired in magistrate court but Chester testified that he wrote to the reporter "and asked him for it (a transcript), he wrote back and asked me what I wanted with it, and I told him I figured it might help me get out of the pen, and I never did hear from him no more, and then I wrote again after it, and they told me he was dead and they didn't know where the records was at." On October 22, 1949, an information charging Chester with murder in the first degree was filed and on that same day he entered a plea of guilty and was sentenced to life imprisonment.

One other background matter, as it appears from this record, is that in 1949 Chester was forty-eight years old, and had a third grade education "near Hamilton, Alabama." He said that he could read and write and count money but could not add or subtract. He had no prior criminal record other than being arrested at Osceola and Joiner, Arkansas, "a few times for being drunk." There was no record of a mental examination except a 1958 intelligence test made in the Missouri penitentiary and that concludes "Intellectually, the subject is functioning within the borderline defective area of intelligence. I.Q. 76. His low performance on some of the subtest items in the intelligence test can be attributed more to the functions of poor cultural and educational background than lack of native capacity."

The judgment entered on October 22, 1949, upon Chester's plea of guilty, in addition to the sentence of life imprisonment for first degree murder, contains these recitals:

"Now on this 22nd day of October, 1949, comes the State of Missouri by the Prosecuting Attorney, and comes also the defendant in proper person in custody of the Sheriff in open court, but without counsel, the court having prior to the entrance of the defendant's plea herein, given the defendant due and ample opportunity and time to talk with a friend and an attorney, and having informed the defendant of his right to counsel, and explained wherein exercise of said right (sic) be of benefit to the defendant, and having explained to the defendant the nature of the charge filed against him, and having found that the defendant was mentally able and sufficiently informed to decide as to his need for counsel; and

"2. The Court having offered to appoint counsel for the defendant to conduct his defense, but the defendant having specifically and expressly waived such right and asserted that he did not desire counsel."

In this background is presented the question of whether Chester intelligently and understandingly waived his right to the assistance of counsel "at the time of his *arraignment*." More precisely upon this particular record the question is whether he sustained his burden of showing, prima facie, that he did not intelligently and understandingly waive his right to counsel. Appellant's present counsel points up the problem by these statements in his argument: "Admittedly the record of the judgment recites the contrary (intelligent waiver), and defendant-appellant must, therefore, overcome the presumption of regularity which attaches in favor of the judgment. The evidence presented at the hearing, uncontradicted by any evidence of the State, is sufficient to sustain defendant's burden and to demonstrate that no court could lawfully have found an intelligent and understanding waiver of the right to counsel and entry of a guilty plea to the charge of first degree murder under the circumstances present in this case." The appellant contends that upon this particular record, the state offering no testimony whatever, his "motion to vacate must be granted as a matter of law."

In view of the disposition to be made of this particular appeal it is not necessary to consider all these matters in the detail that would be necessary in considering and determining the cause upon its merits or, as the appellant urges, deciding whether as a matter of law his motion to vacate should be sustained. In 1949, as well as now, murder in the first degree was a capital offense, the minimum punishment for which was life imprisonment. RSMo 1959, §§ 559.010, 559.030, V.A.M.S. This fact alone, at least for present purposes, distinguishes the two principal cases upon which the state relies, State v. Glenn, Mo., 317 S.W.2d 403, and State v. Kackley, Mo., 391 S.W.2d 350. Compare: Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70. It is not necessary to elaborate upon the complexity of homicide in this jurisdiction, its degrees, its lesser and included offenses, its grades of punishment and defenses including the distinctions in excusable and justifiable homicide (RSMo 1939, §§ 4049, 4376, 4378–4381, 4391, 4844), that was done twenty-two years ago by the Supreme Court of the United States in two capital offenses, one murder in the first degree and the other robbery in the first degree. Tomkins v. State of Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407; Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398. In the murder case, Tomkins v. State of Missouri, the court briefly summarized the situation, "The nature of the charge emphasizes the need for counsel. Under Missouri law one charged with murder in the first degree may be found guilty of that offense, of murder in the second degree, or of manslaughter. Rev.Stat.1939, §§ 4376, 4844, Mo.R.S.A. The punishments for the offenses are different. §§ 4378, 4391. The differences between them are governed by rules of construction meaningful to those trained in the law but unknown to the average layman. The defenses cover a wide range. And the ingredients of the crime of murder in the first degree as distinguished from the lesser offenses are not simple but ones over which skilled judges and practitioners have disagreements. The guiding hand of counsel is needed lest the unwary concede that which only bewilderment or ignorance could justify or pay a penalty which is greater than the law of the State exacts for the offense which they in fact and in law committed." And it is not necessary to elaborate upon the subject but by both rule and statute Missouri has always recognized that arraignment is indeed "a critical stage" in a criminal proceeding requiring the appointment of counsel not only in homicide cases but upon arraignment for any "felony." RSMo 1959, § 545.820, V.A.M.S.; Criminal Rule 29.01. The limitation in both the rule and statute is that the court is only required to assign counsel at the "request" of the person arraigned. The rule and the statute have been modified recently by court decision and by practice in this respect but it is not necessary to go into those factors here. It is sufficient for the purposes of this case that the Supreme Court of the United States has said that "[w]hen one pleads to a capital charge without benefit of counsel, we do not stop to determine whether prejudice resulted. Williams v. Kaiser, 323 U.S. 471, 475, 476, 65 S.Ct. 363, 366, 89 L.Ed. 398 [402] (a Missouri case) * * *. In this case, as in those, the degree of prejudice can never be known. Only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 114. This may be sufficient to dispose of this case but as indicated it is neither necessary nor desirable upon this record as it now stands to dispose of this appeal upon its merits or as a matter of law.

The state offered no evidence, upon this hearing there was in fact but a single witness, the appellant. While there was a hearing on Chester's motion to vacate there was no finding of fact, the court simply entered an order overruling the motion.

Insofar as it relates to the federal constitutional problem and Criminal Rule 27.26 Chester gave this testimony:

"Q. Did you have an attorney to represent you at any time? A. No, sir.

"Q. Did you ask that one be appointed?

"A. No, I didn't, and I didn't know that they'd appoint me one, when I went up before the Judge after I done told them I'd plead guilty, then they said—

"Q. After you told him you would plead guilty?

"A. Yes, sir. They told me if I wanted to stand a jury trial that the State would appoint me an attorney, and I told them—

"Q. What did you say to that?

"A. I told him, I says, 'Well, I'll just' —just what I said, I said, 'I just as well take the rap and go ahead.' He says, 'Well, are you guilty of first degree murder?' And I said, 'Well, yeah, if that's what you want me to say, I'm guilty.' "

\*    \*    \*    \*    \*    \*

"Q. Do you know now that there are several different types of homicide crimes in the State of Missouri?

"A. Well, I do now, yes, sir.

"Q. Did you know that then?

"A. No, sir, I didn't know it. I didn't know very little about any kind of law, because I never had no education."

\*    \*    \*    \*    \*    \*

"Q. Did you know the defenses that were available, defenses to murder that might make it manslaughter?

"A. No, sir, sure didn't."

\*    \*    \*    \*    \*    \*

"Q. And you pleaded guilty to first degree murder? A. Yes, sir.

"Q. And you didn't have the advice of a lawyer at the time?

"A. No, sir, I didn't have no lawyer.

"Q. Were you aware that there might have been a lesser crime that you could be convicted of than first degree murder back then?

"A. Well, I didn't know, I thought maybe that if I could have had a lawyer, the reason why they told me I was pleading guilty, that I didn't have no lawyer."

\*    \*    \*    \*    \*    \*

"A. No, I figured if I could have a lawyer that it would go easy, but the Prosecuting Attorney wouldn't tell me nothing, only I asked him two or three times, and he said all that it would carry was a life or death penalty—

"Q. He said that was the only thing you could get?

"A. Yes, sir, and I was scared then of that penalty and figured maybe it might be better to just plead guilty to it, he had told me that if I pled guilty that I wouldn't get the death penalty.

"Q. Did the court offer you a lawyer before they asked you to plead guilty or not guilty or was that afterwards?

"A. No, they never mentioned a lawyer.

"Q. Not until after?

"A. Until after I was done and up there and pled guilty."

On cross-examination by the prosecuting attorney:

"Q. Now, I want you to think back, Mr. Scott, did Judge Billings, at the time you pleaded guilty, tell you that he would appoint you a lawyer.

"A. Yes, sir. I thought I told that awhile ago. Yeah, after I pled guilty he said that the State would furnish me a lawyer if I wanted to stand a jury trial.

"Q. He told you that you could have a lawyer and you could have a jury trial?

"A. Yes, sir.

"Q. But you didn't want one? A. Yes, sir."

Then there were these pertinent questions by the court and Chester's answers:

"Q. Now, Mr. Scott, I wish you would tell me again just in your own way what you said happened on the day that you pleaded guilty before Judge Billings, can you tell us just what happened from the time your case was called?

"A. When I got up there he asked me—before he ever said anything about an attorney, he says, 'You're charged with first degree murder. Are you guilty or not?' And that's when I told him, I said, 'Well, yeah.' I said, 'I killed a man, but I done it in self-defense, and being that I ain't got money to hire a lawyer I guess I just as well take the rap and go ahead.' And then he says, 'Well, if you want'—says, 'The State will appoint you a lawyer if you want to stand a trial.' And I told him then, I says, 'No, I'll just plead guilty.' And he says, 'Well, are you guilty of first degree murder?' I says, 'Well, yeah, if that's what you want me to say, I'm guilty.' And that's all I remember about it."

\* \* \* \* \* \*

"Q. At the time that you told Judge Billings that you would plead guilty, did you know then that a lawyer might be of help to you?

"A. Well, I knowed that he might be, but I don't know why I didn't, how come me to go ahead and plead guilty to it. In fact, I was just scared until I didn't know hardly what I was doing, on account they kept telling me about that life penalty, I didn't know what the outcome of it might be."

■ Upon this testimony "the petitioner had sustained (prima facie) his ultimate burden of proving that his plea of guilty was invalidly accepted as obtained without the benefit of counsel and that he did not waive his right to counsel" (Moore v. State of Michigan, 355 U.S. 155, 165, 78 S.Ct. 191, 197, 2 L.Ed.2d 167, 174; Hamilton v. State of Alabama, supra; Tomkins v. State of Missouri, supra; Williams v. Kaiser, supra) but, as a district court observed when the state "called no witness to rebut petitioner's testimony," "[t]he issue is to be determined against the totality of all the circumstances." United States ex rel. Brown v. Fay, D.C., 242 F.Supp. 273, 278. The record here, containing only appellant's petition, exhibits and testimony, and the court's cryptic order is fragmentary at best and the cause is reversed and remanded to the end that instead of a piecemeal record all possible circumstances may be adduced (Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; United States v. Commonwealth of Pennsylvania, 3 Cir., 343 F.2d 447, 451–452) as "[a] judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309. With a complete record of all known facts and circumstances, or such as can be fairly adduced after the lapse of seventeen years, this or any other court may with some degree of confidence determine whether the case falls within and is governed by the Hamilton, Moore, Tomkins and Williams cases or whether it may be controlled by the divided opinion in Quicksall v. People of State of Michigan, 339 U.S. 660, 70 S.Ct. 910, 94 L.Ed. 1188, or even by the noncapital cases, Carnley v. Cochran, supra.

STOCKARD, C., concurs.

PRITCHARD, C., not sitting.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.